RECORD NO. 21-7014

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals
### For The District of Columbia Circuit

## ALTAGRACIA SANCHEZ;
## DALE SORCHER; JILL HOMAN,

*Plaintiffs - Appellants*,

**v.**

## OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION; DISTRICT OF COLUMBIA,

*Defendants - Appellees.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

―――――――

### JOINT APPENDIX

―――――――

Renée Flaherty
Robert J. McNamara
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia  22203
(703) 682-9320
rflaherty@ij.org
rmcnamara@ij.org

Graham E. Phillips
Loren L. AliKhan
Carl J. Schifferle
Caroline S. Van Zile
OFFICE OF THE ATTORNEY GENERAL
400 Sixth Street, NW, Suite 8100
Washington, DC  20001
(202) 727-3400
graham.phillips@dc.gov
loren.alikhan@dc.gov
carl.schifferle@dc.gov
caroline.vanzile@dc.gov

*Counsel for Appellants*

*Counsel for Appellees*

## <u>TABLE OF CONTENTS</u>

<u>Appendix Page</u>

Docket Entries...................................................................................... 1

First Amended Complaint for Declaratory and Injunctive Relief
     filed July 30, 2020 ........................................................................ 8

Order of
The Honorable Rudolph Contreras
Re: Granting Defendants' Motion to Dismiss and Denying as
Moot Plaintiffs' Motion for Discovery Notwithstanding the
Motion to Dismiss
     filed January 13, 2021.................................................................... 50

Memorandum Opinion of
The Honorable Rudolph Contreras
Re: Granting Defendants' Motion to Dismiss and Denying as
Moot Plaintiffs' Motion for Discovery Notwithstanding the
Motion to Dismiss
     filed January 13, 2021.................................................................... 51

Plaintiffs' Notice of Appeal
     filed February 10, 2021 ................................................................. 72

APPEAL,CLOSED,TYPE-L

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:18-cv-00975-RC

SANCHEZ et al v. OFFICE OF THE STATE
SUPERINTENDENT OF EDUCATION
Assigned to: Judge Rudolph Contreras
Case in other court:   USCA, 19-07072
                       USCA, 19-07085
                       DC Circuit, 21-07014
Cause: 42:1983 Civil Rights Act

Date Filed: 04/26/2018
Date Terminated: 01/14/2021
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**ALTAGRACIA SANCHEZ**　　　　　　represented by **Robert J. McNamara**
INSTITUTE FOR JUSTICE
901 North Glebe Road
Suite 900
Arlington, VA 22203
(703) 682-9320
Fax: (703) 682-9321
Email: rmcnamara@ij.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Renee Flaherty**
INSTITUTE FOR JUSTICE
901 North Glebe Road
Suite 900
Arlington, VA 22203
(703) 682-9320
Fax: (703) 682-9321
Email: rflaherty@ij.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DALE SORCHER**　　　　　　represented by **Robert J. McNamara**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Renee Flaherty**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JILL HOMAN**　　　　　　represented by **Robert J. McNamara**
(See above for address)

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Renee Flaherty**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**OFFICE OF THE STATE**                    represented by  **Mateya Beth Kelley**
**SUPERINTENDENT OF EDUCATION**                            OFFICE OF THE ATTORNEY GENERAL
                                                           FOR THE DISTRICT OF COLUMBIA
                                                           400 Sixth Street, NW
                                                           Suite 10100
                                                           Washington, DC 20001-2703
                                                           202-724-7854
                                                           Email: Mateya.Kelley@dc.gov
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Gavin Noyes Palmer**
                                                           OFFICE OF THE ATTORNEY GENERAL
                                                           FOR THE DISTRICT OF COLUMBIA
                                                           400 6th Street NW
                                                           Washington, DC 20001
                                                           202-805-7440
                                                           Email: gavin.palmer@dc.gov
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Gregory Martin Cumming**
                                                           U.S. DEPARTMENT OF JUSTICE
                                                           Public Interest Division/Civil Enforcement
                                                           Section
                                                           150 M Street, N.E.
                                                           Suite 2.900
                                                           Washington, DC 20002
                                                           202-598-0414
                                                           Email: gregory.cumming@usdoj.gov
                                                           *TERMINATED: 02/21/2020*

                                                           **Michael A. Tilghman**
                                                           U.S. ATTORNEY'S OFFICE FOR THE
                                                           DISTRICT OF COLUMBIA
                                                           555 Fourth Street, NW
                                                           Washington, DC 20530
                                                           (202) 252-7113
                                                           Email: michael.tilghman@usdoj.gov
                                                           *TERMINATED: 07/09/2020*

**Defendant**

**DISTRICT OF COLUMBIA**                    represented by  **Mateya Beth Kelley**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gavin Noyes Palmer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gregory Martin Cumming**
(See above for address)
*TERMINATED: 02/21/2020*

**Michael A. Tilghman**
(See above for address)
*TERMINATED: 07/09/2020*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/26/2018 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0090-5443785) filed by DALE SORCHER, ALTAGRACIA SANCHEZ, JILL HOMAN. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to District of Columbia, # 3 Summons to Office of the State Superintendent of Education)(Flaherty, Renee) (Entered: 04/26/2018) |
| 04/26/2018 | 2 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Robert J. McNamara, :Firm- Institute for Justice, :Address- 901 N. Glebe Road, Suite 900 Arlington, VA 22203. Phone No. - (703) 682-9320. Fax No. - (703) 682-9321 Filing fee $ 100, receipt number 0090-5443899. Fee Status: Fee Paid. by JILL HOMAN, ALTAGRACIA SANCHEZ, DALE SORCHER (Attachments: # 1 Declaration of Robert J. McNamara, # 2 Proposed Order, # 3 Certificate of Service)(Flaherty, Renee) (Entered: 04/26/2018) |
| 04/26/2018 | | Case Assigned to Judge Rudolph Contreras. (jd) (Entered: 04/26/2018) |
| 04/27/2018 | 3 | SUMMONS (2) Issued Electronically as to OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION and the District of Columbia Mayor. (Attachments: # 1 Notice and Consent)(zrdj) (Entered: 04/27/2018) |
| 05/07/2018 | 4 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DISTRICT OF COLUMBIA served on 4/30/2018 (Flaherty, Renee) (Entered: 05/07/2018) |
| 05/07/2018 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION served on 4/30/2018 (Flaherty, Renee) (Entered: 05/07/2018) |
| 05/09/2018 | 6 | NOTICE of Appearance by Gregory Martin Cumming on behalf of DISTRICT OF COLUMBIA, OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION (Cumming, Gregory) (Entered: 05/09/2018) |
| 05/15/2018 | 7 | NOTICE of Appearance by Michael A. Tilghman on behalf of DISTRICT OF COLUMBIA, OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION (Tilghman, Michael) (Entered: 05/15/2018) |
| 05/15/2018 | 8 | Consent MOTION for Extension of Time to *Respond to Plaintiffs' Complaint* by DISTRICT OF COLUMBIA, OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION (Attachments: # 1 Text of Proposed Order)(Tilghman, Michael) (Entered: 05/15/2018) |
| 05/15/2018 | | MINUTE ORDER granting 8 Defendants' Consent Motion for Extension of Time: It is |

| | | |
|---|---|---|
| | | hereby ORDERED that Defendants shall respond to the Complaint on or before June 20, 2018. SO ORDERED. Signed by Judge Rudolph Contreras on May 15, 2018. (lcrc3) (Entered: 05/15/2018) |
| 05/15/2018 | | Set/Reset Deadlines: Answer due by 6/20/2018. (tj) (Entered: 05/15/2018) |
| 06/15/2018 | | ORDER granting 2 Motion for Leave to Appear Pro Hac Vice: Pursuant to Local Civil Rule 83.2(d), it is hereby ORDERED that Robert J. McNamara is admitted to represent Plaintiffs pro hac vice in this case. SO ORDERED. Signed by Judge Rudolph Contreras on June 15, 2018. (lcrc3) (Entered: 06/15/2018) |
| 06/20/2018 | 9 | MOTION to Dismiss *Plaintiffs' Complaint* by DISTRICT OF COLUMBIA, OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Text of Proposed Order)(Tilghman, Michael) (Entered: 06/20/2018) |
| 06/22/2018 | 10 | Consent MOTION for Extension of Time to File Response/Reply as to 9 MOTION to Dismiss *Plaintiffs' Complaint* by JILL HOMAN, ALTAGRACIA SANCHEZ, DALE SORCHER (Attachments: # 1 Proposed Order)(Flaherty, Renee) (Entered: 06/22/2018) |
| 06/22/2018 | | MINUTE ORDER granting 10 Plaintiffs' Consent Motion for Extension of Time: It is hereby ORDERED that Plaintiffs shall file an opposition to Defendants' motion to dismiss on or before July 19, 2018, and Defendants shall file a reply on or before August 2, 2018. SO ORDERED. Signed by Judge Rudolph Contreras on June 22, 2018. (lcrc3) (Entered: 06/22/2018) |
| 06/25/2018 | | Set/Reset Deadlines: Responses due by 7/19/2018. Replies due by 8/2/2018. (tj) (Entered: 06/25/2018) |
| 07/18/2018 | 11 | RESPONSE re 9 MOTION to Dismiss *Plaintiffs' Complaint* filed by JILL HOMAN, ALTAGRACIA SANCHEZ, DALE SORCHER. (Attachments: # 1 Exhibit A-Declaration of Dale Sorcher, # 2 Proposed Order)(Flaherty, Renee) (Entered: 07/18/2018) |
| 08/02/2018 | 12 | REPLY to opposition to motion re 9 MOTION to Dismiss *Plaintiffs' Complaint* filed by DISTRICT OF COLUMBIA, OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION. (Tilghman, Michael) (Entered: 08/02/2018) |
| 02/26/2019 | 13 | ORDER granting in part 9 Motion to Dismiss: See document for details. Signed by Judge Rudolph Contreras on February 26, 2019. (lcrc2) (Entered: 02/26/2019) |
| 02/26/2019 | 14 | MEMORANDUM OPINION granting in part 9 Motion to Dismiss: See document for details. Signed by Judge Rudolph Contreras on February 26, 2019. (lcrc2) (Entered: 02/26/2019) |
| 03/26/2019 | 15 | MOTION to Amend/Correct 1 Complaint, *or to Alter or Amend Judgment* by JILL HOMAN, ALTAGRACIA SANCHEZ, DALE SORCHER (Attachments: # 1 Memorandum in Support of Motion, # 2 Ex. A - First Amended Complaint, # 3 Proposed Order)(Flaherty, Renee) (Entered: 03/26/2019) |
| 04/09/2019 | 16 | Memorandum in opposition to re 15 MOTION to Amend/Correct 1 Complaint, *or to Alter or Amend Judgment* filed by DISTRICT OF COLUMBIA, OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION. (Attachments: # 1 Text of Proposed Order) (Tilghman, Michael) (Entered: 04/09/2019) |
| 04/16/2019 | 17 | REPLY to opposition to motion re 15 MOTION to Amend/Correct 1 Complaint, *or to Alter or Amend Judgment* filed by JILL HOMAN, ALTAGRACIA SANCHEZ, DALE SORCHER. (Flaherty, Renee) (Entered: 04/16/2019) |
| 07/08/2019 | 18 | ORDER denying 15 Motion to Amend/Correct Complaint or to Alter or Amend Judgment: |

| | | |
|---|---|---|
| | | See document for details. Signed by Judge Rudolph Contreras on July 8, 2019. (lcrc2) (Entered: 07/08/2019) |
| 07/08/2019 | 19 | MEMORANDUM OPINION denying 15 Motion to Amend/Correct Complaint or to Alter or Amend Judgment: See document for details. Signed by Judge Rudolph Contreras on July 8, 2019. (lcrc2) (Entered: 07/08/2019) |
| 07/26/2019 | 20 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 14 Memorandum & Opinion, 13 Order on Motion to Dismiss, 19 Memorandum & Opinion, 18 Order on Motion to Amend/Correct by JILL HOMAN, ALTAGRACIA SANCHEZ, DALE SORCHER. Filing fee $ 505, receipt number 0090-6280291. Fee Status: Fee Paid. Parties have been notified. (Flaherty, Renee) (Entered: 07/26/2019) |
| 07/29/2019 | 21 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 20 Notice of Appeal to DC Circuit Court. (tth) (Entered: 07/29/2019) |
| 07/30/2019 | | USCA Case Number 19-7072 for 20 Notice of Appeal to DC Circuit Court, filed by JILL HOMAN, ALTAGRACIA SANCHEZ, DALE SORCHER. (zrdj) (Entered: 07/30/2019) |
| 08/09/2019 | 22 | NOTICE OF CROSS APPEAL as to 14 Memorandum & Opinion, 13 Order on Motion to Dismiss, 19 Memorandum & Opinion, 18 Order on Motion to Amend/Correct by DISTRICT OF COLUMBIA, OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION. Fee Status: No Fee Paid. Parties have been notified. (Cumming, Gregory) (Entered: 08/09/2019) |
| 08/12/2019 | 23 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 22 Notice of Cross Appeal. (tth) (Entered: 08/12/2019) |
| 08/13/2019 | | USCA Case Number 19-7085 for 22 Notice of Cross Appeal, filed by DISTRICT OF COLUMBIA, OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION. (zrdj) (Entered: 08/13/2019) |
| 02/21/2020 | 24 | NOTICE OF WITHDRAWAL OF APPEARANCE as to DISTRICT OF COLUMBIA, OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION. Attorney Gregory Martin Cumming terminated. (Cumming, Gregory) (Entered: 02/21/2020) |
| 07/09/2020 | 25 | MANDATE of USCA as to 20 Notice of Appeal to DC Circuit Court, filed by JILL HOMAN, ALTAGRACIA SANCHEZ, DALE SORCHER, 22 Notice of Cross Appeal, filed by DISTRICT OF COLUMBIA, OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION ; USCA Case Number 19-7072 Consolidated with 19-7085. (Attachments: # 1 USCA Judgment)(zrdj) (Entered: 07/09/2020) |
| 07/09/2020 | | MINUTE ORDER: It is hereby ORDERED that the parties shall meet, confer, and, on or before July 23, 2020, submit a schedule to govern further proceedings. SO ORDERED. Signed by Judge Rudolph Contreras on 07/09/2020. (lcrc3) (Entered: 07/09/2020) |
| 07/09/2020 | 26 | NOTICE OF SUBSTITUTION OF COUNSEL by Mateya Beth Kelley on behalf of All Defendants Substituting for attorney Michael A. Tilghman II (Kelley, Mateya) (Entered: 07/09/2020) |
| 07/09/2020 | 27 | NOTICE of Appearance by Gavin Noyes Palmer on behalf of All Defendants (Palmer, Gavin) (Entered: 07/09/2020) |
| 07/10/2020 | | Set/Reset Deadlines: Meet & Confer Statement due by 7/23/2020. (tj) (Entered: 07/10/2020) |

| 07/21/2020 | 28 | Joint STATUS REPORT by DISTRICT OF COLUMBIA, OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION. (Kelley, Mateya) (Entered: 07/21/2020) |
| --- | --- | --- |
| 07/21/2020 | | MINUTE ORDER: Upon consideration of 28 the parties' joint status report, it is hereby ORDERED that the following schedule shall govern proceedings: Plaintiffs shall file an amended complaint on or before July 30, 2020; Defendants shall file their motion to dismiss on or before August 13, 2020; Plaintiffs shall file a motion for discovery notwithstanding the motion to dismiss on or before August 13, 2020; Plaintiffs shall file their opposition to Defendants' motion to dismiss on or before August 27, 2020; Defendants shall file their reply in support of their motion to dismiss on or before September 10, 2020. SO ORDERED. Signed by Judge Rudolph Contreras on 07/21/2020. (lcrc3) (Entered: 07/21/2020) |
| 07/21/2020 | | Set/Reset Deadlines: Amended Pleadings due by 7/30/2020. Plaintiffs shall file a motion for discovery by 8/13/2020. Motions due by 8/13/2020. Responses due by 8/27/2020 Replies due by 9/10/2020. (tj) (Entered: 07/21/2020) |
| 07/30/2020 | 30 | Consent MOTION to Amend/Correct 1 Complaint, by JILL HOMAN, ALTAGRACIA SANCHEZ, DALE SORCHER (Attachments: # 1 Exhibit Amended Complaint, # 2 Text of Proposed Order Proposed Order)(Flaherty, Renee) (Entered: 07/30/2020) |
| 07/30/2020 | | MINUTE ORDER granting 30 Motion for Leave to Amend Complaint. It is hereby ORDERED that Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief, ECF No. 30-1, shall be deemed filed and served. SO ORDERED. Signed by Judge Rudolph Contreras on 07/30/2020. (lcrc3) (Entered: 07/30/2020) |
| 07/30/2020 | 31 | AMENDED COMPLAINT against DISTRICT OF COLUMBIA, OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION filed by DALE SORCHER, ALTAGRACIA SANCHEZ, JILL HOMAN. (ztth) (Entered: 07/31/2020) |
| 08/13/2020 | 32 | MOTION for Discovery *Notwithstanding Motion to Dismiss* by JILL HOMAN, ALTAGRACIA SANCHEZ, DALE SORCHER (Attachments: # 1 Text of Proposed Order Proposed Order)(Flaherty, Renee) (Entered: 08/13/2020) |
| 08/13/2020 | 33 | MOTION to Dismiss by DISTRICT OF COLUMBIA, OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION (Attachments: # 1 Text of Proposed Order) (Palmer, Gavin) (Entered: 08/13/2020) |
| 08/27/2020 | 34 | Memorandum in opposition to re 33 MOTION to Dismiss filed by JILL HOMAN, ALTAGRACIA SANCHEZ, DALE SORCHER. (Flaherty, Renee) (Entered: 08/27/2020) |
| 08/27/2020 | 35 | Memorandum in opposition to re 32 MOTION for Discovery *Notwithstanding Motion to Dismiss* filed by DISTRICT OF COLUMBIA, OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION. (Kelley, Mateya) (Entered: 08/27/2020) |
| 09/03/2020 | 36 | REPLY to opposition to motion re 32 MOTION for Discovery *Notwithstanding Motion to Dismiss* filed by JILL HOMAN, ALTAGRACIA SANCHEZ, DALE SORCHER. (Flaherty, Renee) (Entered: 09/03/2020) |
| 09/10/2020 | 37 | REPLY to opposition to motion re 33 MOTION to Dismiss filed by DISTRICT OF COLUMBIA, OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION. (Palmer, Gavin) (Entered: 09/10/2020) |
| 01/13/2021 | 38 | ORDER granting 33 Defendants' Motion to Dismiss; denying as moot 32 Plaintiffs' Motion for Discovery. See document for details. Signed by Judge Rudolph Contreras on 1/13/2021. (lcrc3) (Entered: 01/13/2021) |
| 01/13/2021 | 39 | MEMORANDUM OPINION granting 33 Defendants' Motion to Dismiss; denying as moot 32 Plaintiffs' Motion for Discovery. See document for details. Signed by Judge |

| | | Rudolph Contreras on 1/13/2021. (lcrc3) (Entered: 01/13/2021) |
|---|---|---|
| 02/10/2021 | [40](#) | NOTICE OF APPEAL TO DC CIRCUIT COURT as to [39](#) Memorandum & Opinion, [38](#) Order on Motion for Discovery, Order on Motion to Dismiss by JILL HOMAN, ALTAGRACIA SANCHEZ, DALE SORCHER. Filing fee $ 505, receipt number ADCDC-8185529. Fee Status: Fee Paid. Parties have been notified. (Flaherty, Renee) (Entered: 02/10/2021) |
| 02/11/2021 | [41](#) | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re [40](#) Notice of Appeal to DC Circuit Court. (ztth) (Entered: 02/11/2021) |
| 02/18/2021 | | USCA Case Number 21-7014 for [40](#) Notice of Appeal to DC Circuit Court, filed by JILL HOMAN, ALTAGRACIA SANCHEZ, DALE SORCHER. (ztth) (Entered: 02/22/2021) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/16/2021 19:21:03 | | | |
| **PACER Login:** | Rflaherty7 | **Client Code:** | 2035 |
| **Description:** | Docket Report | **Search Criteria:** | 1:18-cv-00975-RC |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
ALTAGRACIA SANCHEZ                                  )
2610 Tenth Street NE                                      )
Washington, DC 20018                                    )
)
DALE SORCHER                                              )
7309 Millwood Road                                        )
Bethesda, MD 20817                                        )
)
JILL HOMAN                                                    )
4919 Seventh Street NW                                  )
Washington, DC 20011                                    )
)
                        Plaintiffs,                              )
)
            v.                                                        )            Civil Case No. 1:18-cv-00975-RC
)
OFFICE OF THE STATE                                    )
SUPERINTENDENT OF EDUCATION             )
1050 First Street NE                                        )
Washington, DC 20002                                    )
)
DISTRICT OF COLUMBIA                              )
1350 Pennsylvania Avenue NW                      )
Suite 316                                                          )
Washington, DC 20004                                    )
)
                        Defendants.                            )
_____)

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      This lawsuit seeks to vindicate the rights of day-care providers in Washington,

D.C., to earn their living caring for young children and the rights of parents to choose whom to

trust to care for their children. Defendant Office of the State Superintendent of Education

(OSSE) recently promulgated regulations that require day-care providers to obtain a college degree in order to keep their jobs. As a result, people who struggle to feed their own families will be forced to attend and pay for irrelevant college courses, such as public speaking and "comparative religion," while working full time. Day cares that employ staff who do not meet the college requirement will face fines, criminal penalties, and closure. Plaintiffs are a parent and two dedicated, competent day-care providers who stand to lose their jobs because of OSSE's new regulations.

2.      In a race to be among the first to require college degrees for day-care providers, OSSE enacted its new regulations via administrative rulemaking with no oversight from the D.C. City Council. At the time the rule was promulgated (December 2, 2016), District of Columbia law provided no legislative oversight of OSSE's rulemaking and no avenue by which affected persons could challenge the rulemaking as arbitrary, capricious, or contrary to law.

3.      The U.S. Constitution forbids OSSE from acting without sufficient oversight by the legislature or the courts. Moreover, the college requirement also violates Plaintiffs' right to earn a living without unreasonable government interference and to equal protection of the laws. Defendants must be enjoined from enforcing OSSE's new day-care rulemaking.

## JURISDICTION AND VENUE

4.      Plaintiffs bring this civil-rights lawsuit pursuant to Article I, Section 8, clause 17 of the U.S. Constitution and the Due Process Clause of the Fifth Amendment to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

5.      Plaintiffs seek declaratory and injunctive relief against the enforcement of OSSE's December 2, 2016 Final Rulemaking; sections 165 and 170 of Chapter 1, Child

Development Facilities: Licensing, of Title 5-A of the District of Columbia Municipal

Regulations (D.C. Mun. Regs. tit. 5-A, §§ 165 and 170); and the practices and policies of

Defendants that deny Plaintiffs' constitutional rights.

6.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

7.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(b).

**PARTIES**

8.      Plaintiff Altagracia Sanchez is a United States citizen and a resident of

Washington, D.C.

9.      Plaintiff Dale Sorcher is a United States citizen and a resident of Bethesda,

Maryland.

10.     Plaintiff Jill Homan is a United States citizen and a resident of Washington, D.C.

11.     Defendant OSSE is the D.C. administrative agency that promulgated the District's

day-care licensing regulations by rulemaking and is charged with enforcing them. *See* D.C. Mun.

Regs. tit. 5-A, § 100.1.

12.     Defendant District of Columbia is a municipal entity organized under the

Constitution and the laws of the United States.

**FACTUAL ALLEGATIONS**

**OSSE's Day-Care Licensing Regulations and the College Requirement**

13.     The District is one of three jurisdictions in the country that require day-care staff

other than day-care center directors to obtain a college degree in order to work. The other two

states are Pennsylvania and Vermont.

14.     Day cares in the District, unlike day cares elsewhere, typically serve children ages

zero to three, because older children are in school due to the city's universal pre-Kindergarten.

3

*See* Pre-K Enhancement and Expansion Amendment Act of 2008, D.C. Law 17-202, D.C. Code § 38-271.02.

### *OSSE's Rulemaking and the CCDBG Act*

15.    OSSE promulgated the District's current day-care licensing regulations, D.C. Mun. Regs. tit. 5-A, §§ 100–199, through an administrative rulemaking that became effective December 2, 2016 ("the Rulemaking").

16.    On June 29, 2018 (two months after this lawsuit was originally filed on April 26, 2018), OSSE finalized another rulemaking that extended the deadlines by which day-care providers must obtain their credentials and extended the ability to obtain experience waivers to expanded-home caregivers ("the Extension").

17.    The Rulemaking repealed the District's old day-care licensing regulations, D.C. Mun. Regs. tit. 29, §§ 300–379, and replaced them with D.C. Mun. Regs. tit. 5-A, §§ 100–199.

18.    The original purpose of the Rulemaking was to comply with the federal Child Care and Development Block Grant Act of 2014 ("CCDBG Act"), 42 U.S.C. §§ 9858 *et seq*. *See* OSSE Notice of Final Rulemaking, 63 D.C. Reg. 14640 (Dec. 2, 2016), https://osse.dc.gov/ sites/default/files/dc/sites/osse/publication/attachments/Final%20Rulemaking%20for%20the%20 Licensing%20of%20Child%20Development%20Facilities_0.pdf.

19.    The CCDBG Act appropriated federal funds to the states for child-care programs. In order to receive CCDBG Act funds, states must create a plan to revise their day-care licensing laws to implement quality monitoring, reporting, inspection, consumer and provider education, licensing, training, child-to-provider ratio, health and safety, special-needs, and disaster-preparedness requirements. *See* 42 U.S.C. § 9858c; 45 C.F.R. §§ 98–99.

20.     The CCDBG Act does *not* require or recommend that states increase day-care providers' education requirements. *See* 42 U.S.C. § 9858c(c)(2)(G)(iv) ("The Secretary [of Health and Human Services] shall not require an individual or entity that provides child care services for which assistance is provided . . . to acquire a credential to provide such services.").

### *Who Must Be Licensed*

21.     All day-care facilities in the District of Columbia must be licensed by OSSE. *See* D.C. Code § 7-2034(a); D.C. Mun. Regs. tit. 5-A, § 102.1.

22.     The Rulemaking denotes four different kinds of day cares: day-care centers, home day cares, expanded-home day cares, and out-of-school-time programs.

23.     All day cares located outside a provider's home and serving more than twelve children ("day-care centers") must be licensed. *See* D.C. Mun. Regs. tit. 5-A, §§ 101.3(c)(1), 199.1.

24.     All day cares located in a provider's home and serving up to six children ("home day cares") must be licensed. *See id.* at §§ 101.3(c)(2), 199.1.

25.     All day cares located in a provider's home, serving no less than seven and up to twelve children ("expanded-home day cares"), must be licensed. *See id.* at §§ 101.3(c)(3), 199.1.

26.     All day cares that provide care for children of legal school age who are enrolled in public, private, and charter schools before or after normal school hours ("out-of-school-time programs") must be licensed. *See id.* at §§ 101.3(c)(4), 199.1.

27.     Many child-care providers are exempt from the District's day-care licensing laws. These include babysitters; nannies; nanny-shares; parent-supervised play groups; adult gyms or clubs that provide child-care services as a benefit of membership; adult-education programs that provide temporary child care while parents are on the campus; child-centered businesses that

provide sessions, classes, or activities such as tutoring, music, dance, sport, or art while parents are on the premises; places of worship that provide child care during religious services; care by related persons; federal facilities operated by the federal government; pre-Kindergarten through 12th grade public and charter schools; pre-Kindergarten through 12th grade private schools providing education during the full school day; OSSE-funded pre-Kindergarten facilities; and facilities that provide *only* before- or after-school care or summer camp for school-age children. *See id.* at § 101.5.

28.    OSSE has recently tried to narrow the exemption for parent-supervised play groups.

29.    Parent-supervised play groups are a longstanding tradition in the District in which families get together one or two days a week and supervise their children while they play. None of the parents are paid. At the end of each year, one group of parents turns over the playgroup to the next group of parents.

30.    Parent-supervised play groups cannot afford to comply with OSSE's licensing requirements, which would entail hiring permanent (and college-educated) staff such as directors and teachers and complying with numerous other facilities and staffing regulations.

31.    In 2017, OSSE tried to force a play group in Petworth to obtain a child development facility license. That play group ended up moving to a federal building, which is outside of OSSE's jurisdiction.

32.    In late 2018, OSSE tried to force the Capitol Hill Cooperative Play School (CHCPS)—a parent-led play group that has existed since the 1960s—to obtain a child development facility license.

33.    CHCPS rallied parents and managed to persuade the D.C. City Council to pass legislation clarifying that play groups like theirs are exempt from OSSE licensure. *See* Parent-led Play Cooperative Amendment Act of 2018, D.C. Law 22-277.

### *Staff Qualifications Under the Rulemaking: Day-Care Center Directors*

34.    As a result of the Rulemaking, day-care center directors must obtain a bachelor's degree by December 2, 2022.

35.    As a result of the Rulemaking, newly hired day-care center directors must have at least a bachelor's degree from an accredited college with at least 15 semester credit hours in early-childhood development, early-childhood education, elementary education, or early special education, and one year of supervised experience working with children in a licensed day care. *See* D.C. Mun. Regs. tit. 5-A, § 164.1(a).

36.    As a result of the Rulemaking, day-care center directors who have already earned an associate's degree from an accredited college with a major in early-childhood education or early-childhood development, and have at least three years of supervised experience working with children in a licensed day-care center, may retain their jobs or be hired on the condition that they obtain a bachelor's degree from an accredited school in compliance with D.C. Mun. Regs. tit. 5-A, § 164.1(a) by December 2, 2022. *See id.* at § 164.1(b).

37.    As a result of the Rulemaking, day-care center directors who (1) are already employed as a director as of December 2, 2016; (2) have earned at least 48 semester credit hours from an accredited college, with at least 15 hours in early-childhood education or early-childhood development; and (3) have at least four years of experience working with children in a licensed day-care center may keep their jobs, provided that they obtain their bachelor's degree in compliance with D.C. Mun. Regs. tit. 5-A, § 164.1(a) or (b) by December 2, 2022. *See id.* at

§ 164.1(c).

38.    Private, parochial, or independent schools are exempt from the director-education requirement if the school (1) has a pre-Kindergarten, elementary, or secondary education program; (2) cares for infants and toddlers on the same premises as school-age children; (3) is accredited by a body approved by OSSE; and (4) does not offer subsidized child care. *See id.* at § 164.4.

39.    Day-care facilities may apply to have the director-education requirement waived for a director employed as of December 2, 2016, who has continuously served as a day-care center director for the past ten years. *See id.* at § 164.3.

40.    OSSE may deny an experience waiver for any reason consistent with its reasons for denying a hardship waiver, described below at paragraph 70. *See id.*

41.    OSSE issues experience waivers at its discretion, and they can be revoked at any time. *See id.* at § 106.5.

### *Staff Qualifications Under the Rulemaking: Day-Care Center Teachers*

42.    Under the Rulemaking, day-care center teachers were required to obtain an associate's degree by December 2, 2020. Under the Extension, this deadline is now December 2, 2023.

43.    As a result of the Rulemaking, day-care center teachers with no experience must have at least an associate's degree from an accredited college with a major in early-childhood education, early-childhood development, child and family studies, or a closely related field. *See id.* at § 165.1(a).

44.    As a result of the Rulemaking, day-care center teachers with one year of supervised experience working with children in a licensed day-care center (as of December 2,

2016) must have at least an associate's degree from an accredited college with any major, *provided that* they have at least 24 credit hours in early-childhood education, early-childhood development, child and family studies, or a closely related field. *See id.* at § 165.1(b).

45.    Under the Rulemaking, day-care center teachers with two years of supervised experience working with children in a licensed day-care center (as of December 2, 2016) must have earned at least 48 semester credit hours from an accredited college, of which 15 hours must be in early-childhood education, early-childhood development, or child and family studies; *provided that* they obtain by December 2, 2020, at least (1) an associate's degree with a major in early-childhood education, early-childhood development, child and family studies, or a closely related field; *or* (2) an associate's degree in any major with at least 24 semester credit hours in early-childhood education, early-childhood development, child and family studies, or a closely related field. *See id.* at § 165.1(c). Under the Extension, this deadline is now December 2, 2023.

46.    Under the Rulemaking, day-care center teachers who have a high-school diploma or its equivalent and a Child Development Associate credential (CDA) for the correct age classification may work as a teacher, provided that they obtain an associate's degree in compliance with D.C. Mun. Regs. tit. 5-A, § 165.1(a) or (b) by December 2, 2020. *See id.* at § 165.1(d). Under the Extension, this deadline is now December 2, 2023.

47.    A CDA costs $425, requires 120 hours of child-care specific training, and takes a few months to a year to obtain.

48.    Private, parochial, or independent schools are exempt from the teacher-education requirement if the school (1) has a pre-Kindergarten, elementary, or secondary education program; (2) cares for infants and toddlers on the same premises as school-age children; (3) is accredited by a body approved by OSSE; and (4) does not offer subsidized child care. *See id.* at

§ 165.6.

49.     Day-care facilities may apply to have the teacher-education requirement waived for a teacher employed as of December 2, 2016, and who has continuously served as a teacher for the past ten years. *See id.* at § 165.4.

50.     OSSE may deny an experience waiver for any reason consistent with its reasons for denying a hardship waiver, described below at paragraph 70. *See id.*

51.     OSSE issues experience waivers at its discretion, and they can be revoked at any time. *See id.* at § 106.5.

### *Staff Qualifications Under the Rulemaking: Day-Care Center Assistant Teachers*

52.     Under the Rulemaking, day-care center assistant teachers were required to obtain a high-school diploma or its equivalent and must have obtained a CDA by December 2, 2018. *See id.* at § 166.1. Under the Extension, this deadline is now December 2, 2019.

53.      Private, parochial, or independent schools are exempt from the assistant-teacher education requirement if the school (1) has a pre-Kindergarten, elementary, or secondary education program; (2) cares for infants and toddlers on the same premises as school-age children; (3) is accredited by a body approved by OSSE; and (4) does not offer subsidized child care. *See id.* at § 166.4.

54.     No experience waiver is available for day-care center assistant teachers.

### *Staff Qualifications Under the Rulemaking: Expanded-Home Day-Care Caregivers*

55.     Under the Rulemaking, caregivers in expanded-home day cares were required to obtain an associate's degree by December 2, 2019. Under the Extension, this deadline is now December 2, 2023.

56.    Under the Rulemaking, caregivers in expanded-home day cares must have at least one year of experience working with children in a licensed day-care center or home day care and at least an associate's degree from an accredited college with a major in early-childhood education, early-childhood development, child and family studies, or a closely related field. *See id.* at § 170.2(a)(1) & (b).

57.    Under the Rulemaking, caregivers in expanded-home day cares who have a high-school diploma or its equivalent, a CDA, and at least one year of experience working with children in a licensed day-care center or home day care were allowed to continue to work, provided that they obtain at least an associate's degree with a major in early-childhood education, early-childhood development, child and family studies, or a closely related field by December 2, 2019. *See id.* at § 170.2(a)(2) & (b). Under the Extension, this deadline is now December 2, 2023.

58.    Under the Rulemaking, no experience waiver was available to expanded-home day-care caregivers. The Extension, however, made expanded-home caregivers eligible to apply for experience waivers. *Id.* at § 170.2(c).

### *Staff Qualifications Under the Rulemaking: Expanded-Home Day-Care Assistant Caregivers*

59.    Under the Rulemaking, assistant caregivers in expanded-home day cares were required to obtain at least one year of experience working in a licensed home day care or in a licensed day-care center; a high-school diploma or its equivalent; and obtain a CDA by December 2, 2018. *See id.* at § 171.1. Under the Extension, this deadline is now December 2, 2019.

60.     No experience waiver is available for expanded-home day-care assistant caregivers.

11

### *Staff Qualifications Under the Rulemaking: Home Day-Care Caregivers*

61.    Under the Rulemaking, caregivers in home day cares were required to obtain a high-school diploma or its equivalent and a CDA by December 2, 2018. *See id.* at § 168.1. Under the Extension, this deadline is now December 2, 2019.

62.    No experience waiver is available for home day-care caregivers.

### *The Hardship Waiver*

63.    In addition to the experience waiver, OSSE may waive compliance with provisions of its day-care licensing regulations if "demonstrated immediate economic impact or hardship on the Facility or staff member is sufficiently great to make immediate compliance impractical despite diligent efforts" (a "hardship waiver"). *Id.* at § 106.1(a). Additionally, the "[f]acility or staff member [must] meet[] or exceed[] the intent of the regulation for which the waiver is requested." *Id.* at §106.1(b). Finally, the "health and welfare of staff and children [must not be] jeopardized." *Id.* at § 106.1(c).

64.    Upon information and belief, OSSE has not publicly announced what constitutes "demonstrated immediate economic impact or hardship" or "diligent efforts" to comply with the day-care licensing regulations.

65.    OSSE requires a description and documentation of "demonstrated immediate economic impact or hardship" and "diligent efforts" in order to apply for a hardship waiver. *See* https://osse.dc.gov/sites/default/files/dc/sites/osse/page_content/attachments/Request%20for%20Waiver%20General%20Waiver.pdf.

66.    OSSE does not explain what kind of documentation should be provided for hardship waivers.

67.    OSSE requires two of the following forms of documentation for experience waivers: (1) a professional resumé that includes all relevant employment experience; (2) three professional references who can verify previous employment; (3) a letter of affirmation from the provider's current or previous employer that attests to her relevant experience; or (4) professional development certificates corresponding to the provider's dates of service. *See* https://osse.dc.gov/sites/default/files/dc/sites/osse/page_content/attachments/Request%20for%20 Ten%20Years%20of%20Continuous%20Service%20Waiver%20%28Aug.%201%2C%202018 %29_0.pdf.

68.    To grant a hardship or experience waiver, OSSE must make factual findings "upon clear and convincing evidence." *See* D.C. Mun. Regs. tit. 5-A, §106.1.

69.    OSSE issues hardship and experience waivers at its discretion, and they can be revoked at any time upon violation of any condition attached to the waiver or upon OSSE's determination that the waiver is not in the best of interest of children. *See id.* at § 106.5.

70.    Upon information and belief, on May 31, 2017, Elizabeth Groginsky, Assistant Superintendent of Early Learning at OSSE, publicly stated at a meeting with day-care providers and their employees that waiver applications would not be available until the college requirement was "closer" to coming into effect—2019 for expanded-home day-care caregivers who need an associate's degree and 2020 for day-care center teachers who need an associate's degree.

71.    Hardship and experience waiver forms are currently available on OSSE's website.

72.    Teachers and other day-care facility employees cannot apply directly for hardship or experience waivers for themselves.

73.    Instead, day-care facility directors or administrators apply for hardship or experience waivers that apply to the *facilities*, not to individual workers.

74.     Therefore, any day-care employee who is exempt from the college requirement because her employer obtained a waiver for the facility, and who then leaves her job to work at another day care, would have to persuade her new employer to apply for a waiver for her facility, or else the employee would be subject to the college requirement.

### *OSSE's Pre-service Training, Orientation Training, and Ongoing Professional Development*

75.     OSSE also requires (and has always required, even before the Rulemaking) pre-service training, orientation training, and ongoing professional development for all of its day-care staff. *See* D.C. Mun. Regs. tit. 5-A, § 139.

76.     OSSE's pre-service training takes place within 30 days of an employee's hiring date and covers health and safety standards, including (at minimum) child abuse and neglect, prevention, detection, and reporting; emergency preparation; prevention of sudden infant death syndrome and use of safe sleep practices; prevention of shaken baby syndrome and abusive head trauma; and first aid and CPR. *See id.* at § 139.2.

77.     OSSE's orientation training takes place within 90 days of an employee's hiring date and covers additional health and safety standards, including (at minimum) developmentally appropriate programming for infants, toddlers, preschool, and/or school-age children; prevention and control of infectious diseases, including immunization; administration of medication; prevention of and response to emergencies due to food and allergic reactions; building and physical premises safety; and poison prevention, including the handling and storage of hazardous materials and disposal of bio-contaminants. *See id.* at § 139.3.

78.     Day-care staff responsible for transporting children also receive additional orientation training from OSSE. *See id.* at § 139.5.

79.    Staff members who provide direct care for children must be supervised until they receive training in pediatric first aid and CPR, safe sleep practices, standard precautions to prevent communicable disease, poison prevention, and shaken baby syndrome and abusive head trauma. *See id.* at § 139.4.

80.    OSSE's ongoing, annual professional development keeps day-care staff updated on the topics included in their pre-service and orientation training. *See id.* at § 139.7.

81.    OSSE's annual professional development may also include classes about developmentally appropriate programming, methods of positive behavior intervention and support, inclusion of children with special needs, communication with families, community health and social service resources, enhancing children's self-regulation and self-esteem, Montessori curriculum (if applicable), basic or advanced business practices, and any other area determined by OSSE. *See id.* at § 139.8.

82.    Day-care providers can receive their pre-service training, orientation training, and annual professional development in seminars, in-person or online courses, workshops, conferences, or association meetings. These programs must be conducted by an OSSE-approved trainer or by an institution accredited by the U.S. Department of Education or the Council for Higher Education Accreditation. *See id.* at § 139.9.

83.    All day-care center staff must participate in at least 21 hours of professional development annually. *Id.* at § 139.6(a).

84.    All expanded-home day-care caregivers and staff must participate in at least 15 hours of professional development annually. *Id.* at § 139.6(c).

85.    All home day-care caregivers and staff must participate in at least 12 hours of professional development annually. *Id.* at § 139.6(b).

*Penalties for Violating OSSE's Day-Care Licensing Regulations*

86.    OSSE may summarily suspend any day-care facility's license for up to 45 days upon a finding that circumstances present "an imminent danger to the health, safety, or welfare of children, adults, or the general public." *Id.* at § 114.1. An "imminent threat" may include "inadequate staffing." *Id.* at § 114.3.

87.    Violations of OSSE's day-care licensing regulations are punishable by civil fines and/or by criminal penalties of up to $300 or six months in prison. *See id.* at § 116.

## OSSE Promulgated the College Requirement Via Rulemaking With No Oversight

88.    OSSE conducted the Rulemaking without oversight from D.C.'s City Council.

89.    OSSE was not required by law to send the Rulemaking to the D.C. City Council for review at any point in the process.

90.    Upon information and belief, OSSE did not send the Rulemaking to the D.C. City Council for review.

91.    Upon information and belief, OSSE finalized and enacted the Rulemaking without any sort of oversight from the D.C. City Council.

92.    At the time of the Rulemaking, no statute or other law provided for City Council oversight or judicial review of OSSE's rulemakings regarding day cares.

93.    OSSE cites its establishing statute, among other laws, as a source of the agency's authority to promulgate the Rulemaking. *See* OSSE Notice of Final Rulemaking, 63 D.C. Reg. 14640 (citing Establishment of the Office of the State Superintendent of Education, D.C. Code §§ 38-2602(b)(6A), (b)(9), (b)(9A), (b)(11)).

94.    OSSE's establishing statute does not contain any provision subjecting the agency's rulemakings to review by the D.C. City Council.

95.    OSSE's establishing statute does not contain any provision subjecting the agency's rulemakings to judicial review by a court. When federal administrative agencies (which, like D.C. agencies, derive their power from Congress) engage in rulemaking, their actions are subject to judicial review under the federal Administrative Procedure Act. *See* 5 U.S. Code § 706. In contrast, the District's Administrative Procedure Act provides for judicial review in the D.C. Court of Appeals only in "contested cases," which do not include rulemakings. D.C. Code § 2-510.

96.    OSSE's authority to enact rulemakings regarding day-care licensing also originates with the Child Development Facilities Regulation Act of 1998 (the "Facilities Act"), D.C. Code §§ 7-2031 *et seq.* The Facilities Act delegates rulemaking authority to implement the statute to the District's Mayor. *See id.* at § 7-2036(a)(1). This includes the authority to promulgate rules regarding "[m]inimum standards of operation of a child development facility concerning staff qualification, requirements and training[.]" *Id.* at § 7-2036(a)(1)(A).

97.    The Mayor delegated rulemaking authority to implement the Facilities Act to OSSE through a July 16, 2009 Mayor's Order. *See* Mayor's Order 2009-130, https://www.dcregs .dc.gov/Common/NoticeDetail.aspx?noticeId=3440.

98.    Neither the Facilities Act nor the Mayor's July 16, 2009 Order provide any intelligible principle to guide OSSE's rulemaking with respect to day-care provider educational requirements. Moreover, because the Rulemaking is not a "contested case" and there is no opportunity for judicial review, there is no mechanism for a court (or anyone else) to evaluate whether OSSE's actual rulemaking is in keeping with any policies set out by the Facilities Act or the Mayor's July 16, 2009 Order.

17

99.     Because the Rulemaking is not a "contested case" and there is no opportunity for judicial review, OSSE was not required to regulate in a manner that was not arbitrary and capricious, contrary to law, in excess of its authority, or unsupported by substantial evidence.

100.     Because the Rulemaking is not a "contested case" and there is no opportunity for judicial review, when asked for a non-English translation of the proposed rulemaking during the notice and comment period, OSSE declined to create one. *See* Final Rulemaking at 4–5, D.C. Reg. 14643-44.

101.     At the time of the Rulemaking, the Facilities Act did not require rulemakings promulgated pursuant to the statute to be reviewed by the D.C. City Council.

102.     In June 2017, the D.C. City Council imposed a 30-day review period on all of OSSE's future rulemakings pursuant to the Facilities Act. *See* D.C. Act 22-71, Child Development Facilities Regulation Act of 2017, 64 D.C. Reg. 8558; D.C. Code § 7-2036(a)(2). During this review period, the D.C. City Council can disapprove proposed rulemakings under the Facilities Act.

103.     In June 2017, the D.C. City Council also ordered OSSE to conduct a study about the impact of the college requirement on day-care providers and the cost of child care in the District. *See* D.C. Act 22-72, Child Care Study Act of 2017, 64 D.C. Reg. 8559; D.C. Code § 7-2011.03.

104.     The D.C. City Council directed OSSE to complete the study within one year, which would have been sometime in mid-2018.

105.     Upon information and belief, the D.C. City Council imposed the review period on OSSE's day-care rulemakings and ordered the study of the college requirement's costs in direct response to controversy over the college requirement.

106.    On October 22, 2018, Plaintiffs' counsel submitted a District of Columbia Freedom of Information Act request for OSSE's study of the college requirement's costs and relating documents and communications.

107.    On January 10, 2019, OSSE's FOIA officer, Mona Patel, informed Plaintiffs' counsel that OSSE had not yet completed the study.

108.    On March 6, 2019, OSSE responded to Plaintiffs' counsel's D.C. FOIA request and produced no documents or communications related to the study.

109.    The prospective 30-day review period and study have absolutely no effect on OSSE's December 2, 2016 rulemaking, including the college requirement.

110.    The Extension was subject to the new 30-day D.C. City Council review period.

**The College Requirement's Impact on the District's Day-Care Providers and Parents**

111.    As a result of the college requirement, hundreds of qualified day-care providers will be forced to obtain expensive, time-consuming, and largely irrelevant credentials in order to keep their jobs.

112.    Upon information and belief, it will be impossible for many day-care staff to comply with the college requirement.

113.    Upon information and belief, the time required to obtain an associate's degree is an insurmountable obstacle to many day-care providers who work full time and have other responsibilities such as caring for their own families.

114.    Upon information and belief, the money required to obtain an associate's degree is an insurmountable obstacle to many day-care staff who earn wages comparable to those of a fast-food cook.

115.    Upon information and belief, day-care staff in the District earn around $25,000 to $30,000 per year, and many do not receive health insurance or retirement benefits.

116.    Upon information and belief, many of the District's day-care providers are immigrants whose first language is not English.

117.    Upon information and belief, many immigrant day-care providers face an insurmountable language barrier to obtaining a college degree.

118.    Upon information and belief, there are no early-childhood associate's-degree programs available in Spanish in the D.C. metro area.

119.    Upon information and belief, non-English-speaking day-care providers who have no way to obtain a college degree because of a language barrier will lose their jobs when the college requirement comes into effect.

120.    Upon information and belief, there are many language-immersion day-care programs throughout the District.

121.    Upon information and belief, because the District's day-care licensing regulations require higher adult-to-child ratios for infants, care for this age range is the most expensive type of care for a D.C. day care.

122.    Upon information and belief, the District's universal pre-Kindergarten means that day cares cannot make up for the high cost of infant care by caring for less costly older children, because older children are in pre-Kindergarten instead of day care.

123.    Upon information and belief, the District's high rents and zoning rules make it difficult for day-care centers to open and stay operational.

124.    As of December 2023, expanded-home day cares run by caregivers without at least an associate's degree with a major in an early-childhood field will be subject to fines, criminal penalties, and summary closure by OSSE.

125.    As of December 2023, day-care centers that employ teachers without at least an associate's degree with a major in an early-childhood field or an associate's degree in any major with at least 24 credit hours in an early-childhood field will be subject to fines, criminal penalties, and summary closure by OSSE.

126.    Upon information and belief, at present, some day-care centers will not hire new teachers who do not have a college degree.

127.    Upon information and belief, the cost of child care in the District is higher than in any of the 50 states.

128.    Upon information and belief, in 2017, annual costs at a D.C. day-care center averaged $23,089 ($1,924 per month) for an infant.

129.    Upon information and belief, in 2017, the cost of infant care in a D.C. day care ($23,089) was nearly three times higher than the annual cost of college tuition at a four-year public college in the District, which was around $8,060.

130.    Upon information and belief, in 2019, annual costs at a D.C. day-care center averaged $24,081 ($2,006 per month) for an infant.

131.    Upon information and belief, in 2019, the cost of infant care in a D.C. day care ($24,081) was nearly three times higher than the annual cost of college tuition at a four-year public college in the District, which was around $8,250.

132.    Upon information and belief, high day-care costs are a major factor driving people out of the District.

133.     Upon information and belief, waitlists at D.C. day cares can run over a year. Parents who get on a waitlist as soon as they are pregnant can still find themselves without a spot when the baby is born.

134.     Upon information and belief, many D.C. parents are forced to put their children in unlicensed care or to leave the workforce to take care of them.

135.     Upon information and belief, nannies in the District cost between $30,000 and $41,600 a year.

136.     During OSSE's notice and comment period for the Extension (which ran from November 17, 2017, to December 18, 2017), D.C. parents, day-care providers, and concerned citizens spoke out against the new regulations.

137.     D.C. parents, day-care providers, and concerned citizens submitted over 350 written comments opposing OSSE's new education requirements.

### There Is No Reason to Believe That a College Requirement for Day-Care Providers Will Help Children

138.     Neither the Rulemaking nor the Extension provide research or factual bases to support the college requirement.

139.      Based on OSSE officials' statements to the media, the college requirement was inspired by a 2015 report by the National Academies (the "NAS report"). *See* National Academies Press, *Transforming the Workforce for Children Birth Through Age 8: A Unifying Foundation (2015)*, http://www.nationalacademies.org/hmd/Reports/2015/Birth-To-Eight.aspx.

140.     The NAS report recommends at minimum a bachelor's degree requirement for all "lead educators" working with children from birth through age eight. *See* NAS report, Recommendation 2, at 513.

141.    Because the District has universal pre-Kindergarten, day cares in the city serve almost exclusively children ages *zero to three*, not zero to eight.

142.    The NAS report states that there is no empirical support for requiring day-care providers to get college degrees and that there are many negative consequences to doing so.

143.    The NAS report states that "existing research on the relationship between the education level of educators and the quality of instruction or children's learning and development is inconclusive." NAS report at 434; *see also id.* at 6, 514.

144.    The NAS report repeatedly cautions that its recommendations did not take into account the many potential costs involved in requiring day-care providers to get college degrees: the money required to get the degree; the time required to get the degree while working full time; "workforce shortages, reduced diversity in the professions, increased disparities among current and future professionals, upward pressure on out-of-pocket costs to families, and disruptions to the sustainability of operating in the for-profit and not-for-profit care and education market." *See id.* at 7–8; 438.

145.    The NAS report separately recommends a complete overhaul of the existing education system for early-childhood providers, which means that the report recommends that governments require people to obtain degrees and credentials that *the report itself* says do not currently provide any uniform standard of education. *See id.*, Recs. 4 & 5, at 522–29.

146.    Associate's degrees are generalist degrees. Upon information and belief, the majority of courses necessary to obtain an associate's degree in an early-childhood field are completely unrelated to caring for children.

147.    Getting an associate's degree recommended by OSSE requires at least 61 semester credit hours (about 20 classes), the majority of which are completely irrelevant to caring for children. *See* OSSE website, Resources for Teachers, https://osse.dc.gov/page/teacher.

148.    Upon information and belief, Trinity University (a program recommended by OSSE) requires only five courses in an early-childhood field (15 credit hours) for an associate's degree with an "early childhood" emphasis, while 15 other courses (46 credit hours) include (aside from math and English, which are also required) "Logic and Problem Solving," "Introduction to Communication and Public Speaking," "Music and Culture," "Contemporary World History," "Politics and Citizenship," "Science of the Environment," and "Comparative Religions." *See* https://www.trinitydc.edu/thearc/program-guide/.

149.    Upon information and belief, an associate's degree from Trinity College costs about $45,000 in tuition alone (61 credits at $740 per credit) for a part-time student. *See* https://www.trinitydc.edu/enrollment/tuition-and-fees/#cas14.

150.    Upon information and belief, the University of the District of Columbia Community College (a program recommended by OSSE) requires 36 credit hours in early-childhood classes to obtain an associate's degree with a major in Infant/Toddler Education. *See* http://docs.udc.edu/pos/AAS%20Education-Option%201.pdf.

151.    Upon information and belief, the University of the District of Columbia Community College requires 26 credit hours of other coursework for its Infant/Toddler Education associate's degree, including two courses in college math, two courses in English composition, "World Cultural Geography," and "Public Speaking." *See* http://docs.udc.edu/pos/AAS%20Education-Option%201.pdf.

152.    Upon information and belief, an associate's degree from the University of the District of Columbia Community College costs about $10,000 to $15,000 for a part-time student living in the District or its metro area. *See* https://www.udc.edu/cc/fees/.

153.    Upon information and belief, Montgomery College (a program recommended by OSSE) requires only 15 semester credit hours in early-childhood classes to obtain an associate's degree with a major in early-childhood education or early-childhood special education. *See* http://catalog.montgomerycollege.edu/preview_program.php?catoid=8&poid=1699&returnto =1322.

154.    Upon information and belief, Montgomery College requires 48 semester credit hours of other coursework for its associate's degree in early-childhood education or early-childhood special education, including writing and math courses, biology, two courses in United States history, "Global Geography," "Probability, Statistics, and Problem Solving," two physical science courses, and "Personalized Health Fitness." *See* http://catalog.montgomerycollege.edu/ preview_program.php?catoid=8&poid=1699&returnto=1322.

155.    Upon information and belief, an associate's degree from Montgomery College costs about $10,000 to $26,000 for a part-time student, depending on residency. *See* http://www.montgomerycollege.edu/_resources/documents/paying-for-college/montgomery-college-tuition-fee-schedule-2017-2018.pdf.

### **Plaintiff Altagracia Sanchez**

156.    Plaintiff Altagracia Sanchez is 55 years old and originally from the Dominican Republic.

157.    In her home country, Plaintiff Sanchez obtained a doctoral degree in law at Universidad Autonoma de Santo Domingo and worked as an attorney.

158.    In search of a better life, Plaintiff Sanchez moved to the United States in 1995 and became a U.S. citizen in 2008.

159.    Since Plaintiff Sanchez moved to the United States, she has followed her passion by working with children. She has never attended college in the United States.

160.    Plaintiff Sanchez has two adult children. Her daughter just graduated from college and is pursuing her master's degree. Her son is attending college now, and Plaintiff Sanchez is helping him pay for school.

161.    Plaintiff Sanchez worked in a D.C. day-care center for a few years after moving to the United States, and in 2002 she began working as a case worker at Mary's Center, which provides assistance to families and day-care providers in the District.

162.    In 2006, Plaintiff Sanchez obtained her CDA and opened an expanded-home day care in her home in Northeast D.C.

163.    Plaintiff Sanchez's expanded-home day care is called Mundo de Fantasias.

164.    Mundo de Fantasias is licensed for nine children. At present, Plaintiff Sanchez cares for nine children: four infants one year old or under; three two-year-olds; and two three-year-olds.

165.    Plaintiff Sanchez is the primary caregiver at her day care and qualifies as an "expanded-home caregiver" under the Rulemaking.

166.    She employs her daughter and one other person as assistant caregivers.

167.    Plaintiff Sanchez's daughter has a bachelor's degree in early-childhood studies, but she does not plan to work at her mother's day care permanently. Plaintiff Sanchez's other assistant caregiver has a CDA.

168.    Plaintiff Sanchez's husband cooks the food she serves to the children at the day care. Her husband also works as a doorman.

169.    Under OSSE's adult-to-child ratios, Plaintiff Sanchez's day care must have at least three caregivers. *See* D.C. Mun. Regs. tit. 5-A, § 121.3(c). This means that all three caregivers (including Plaintiff Sanchez) must be present at all times if nine children are at the day care.

170.    If all nine children are present, it is impossible for Plaintiff Sanchez to leave her day care without violating OSSE's adult-to-child ratios.

171.    Plaintiff Sanchez's day care operates on weekdays from 7:00 a.m. to 6:00 p.m., and sometimes children stay past 7:00 p.m.

172.    OSSE's college requirement presents Plaintiff Sanchez with only three options: (1) obtain an associate's degree with a major in an early-childhood field by December 2, 2023; (2) obtain a hardship or experience waiver; or (3) face the inevitable loss of her job.

173.    Plaintiff Sanchez interprets OSSE's hardship waiver provision to mean that in order to qualify for a waiver, she would need to be taking steps to attend college now. This is because OSSE's regulations require her to make "diligent efforts" to comply with the day-care licensing regulations in order to receive a hardship waiver. D.C. Mun. Regs. tit. 5-A, § 106.1(a).

174.    OSSE has provided no guidance to Plaintiff Sanchez about the "diligent efforts" she would need to take in order to apply for a hardship waiver.

175.    Assuming Plaintiff Sanchez *could* attend college part-time (which she cannot), it would take her *at least* five years to obtain an associate's degree (around 60 credit hours) by taking two classes (around six credit hours) per semester.

27

176.    Plaintiff Sanchez would also need time to apply for financial aid and student loans.

177.    In addition to obtaining an associate's degree, Plaintiff Sanchez must complete at least 15 hours of OSSE-approved professional development annually.

178.    Plaintiff Sanchez's native language is Spanish. She can speak, read, and write English well enough to run her day care, but she cannot read or write English at a college level.

179.    Plaintiff Sanchez depends on the income from her day care to earn her living and help pay for her son's education. Plaintiff Sanchez cannot afford to shut down her day care in order to attend college.

180.    It is not realistic for Plaintiff Sanchez to attend college part time while working full time at her day care.

181.    If Plaintiff Sanchez had to attend college classes on weekday evenings, she would most likely be forced to violate OSSE's adult-to-child ratios regularly by leaving her day care while children were still present.

182.    Plaintiff Sanchez cannot afford to hire another employee for her day care.

183.    Plaintiff Sanchez cannot afford to go to college out of pocket, and she does not wish to take on debt to pay for college.

184.    Plaintiff Sanchez does not need an associate's degree to care for children at her day care lovingly and competently, which she has done for the past 11 years.

185.    Parents trust Plaintiff Sanchez to care for their children competently and lovingly.

186.    Working with children is Plaintiff Sanchez's passion. She loves running her day care and wishes to continue to do so for the foreseeable future until she retires.

187.    Plaintiff Sanchez applied for an experience waiver on March 15, 2019.

188.     It took Plaintiff Sanchez and her attorneys approximately five hours to put together her application for an experience waiver.

189.     Plaintiff Sanchez's application for an experience waiver was 79 pages long, including the application itself, her professional resumé (which she had to draft from scratch with help from her attorney), copies of her day care's licenses from the past three years, her CDA certification, and certificates from twenty years of professional development courses.

190.     Plaintiff Sanchez received an experience waiver in April 2019.

191.     Since experience waivers are purely discretionary and revocable at any time, Plaintiff Sanchez is afraid that OSSE may revoke hers at some point in the future.

**Plaintiff Dale Sorcher**

192.     Plaintiff Dale Sorcher is a licensed clinical social worker with two master's degrees. She has a master's degree in social work from the Hunter School of Social Work and a master's degree in education and expressive therapy from Lesley College. Plaintiff Sorcher also has a bachelor of fine arts degree in dance from the University of Michigan.

193.     Plaintiff Sorcher works as a teacher at a Jewish preschool in Northwest D.C.

194.     The preschool serves children ages zero to three and is licensed by OSSE as a day-care center. In the normal course of her work, Plaintiff Sorcher does not care for any children older than three years old.

195.     The preschool is part of the synagogue where Plaintiff Sorcher grew up, and her children were all active in the religious school and youth groups there. Plaintiff Sorcher has three adult children: two attending college and one attending medical school.

196.     Plaintiff Sorcher's synagogue has separate programs for children ages 8 to 18 months, two years, three years, and four and five years.

29

197.    Plaintiff Sorcher's synagogue also has educational programs for elementary and high-school students. These programs, called the "Religious School" and the "Ma'alot (High School)," are not traditional, full-time education programs. Instead, they are morning, evening, and weekend programs.

198.    Plaintiff Sorcher's preschool (including the day care) is accredited by the National Association for the Education of Young Children.

199.    Plaintiff Sorcher's preschool (including the day care) does not provide government-subsidized child care.

200.    From 1980 to 1991, Plaintiff Sorcher worked in New York City as a movement therapist and clinical social worker. Plaintiff Sorcher moved to the District and began working with toddlers at the synagogue in 1996, and then she left in 1999 to care for her children full time.

201.    Plaintiff Sorcher returned to the school in 2010, and since then, she has served in a variety of roles such as teacher for the two-year-old class and the "parent/toddler" program.

202.    In the "parent/toddler" program, parents also attend and play with their children.

203.    Plaintiff Sorcher also serves as a substitute teacher for any class in the day care where she is needed, including the two-year-old class.

204.    Plaintiff Sorcher enjoys the flexibility of being able to teach different classes and to serve as a substitute teacher.

205.    Plaintiff Sorcher qualifies as a day-care center "teacher" under the Rulemaking.

206.    Plaintiff Sorcher is passionate about her work with children and families at the synagogue.

207.    Plaintiff Sorcher also works as a licensed clinical therapist in the afternoons.

208.    Plaintiff Sorcher needs 40 hours of continuing-education units every two years to maintain her social-work licenses in Maryland and the District.

209.    Plaintiff Sorcher also needs 21 hours of OSSE-approved continuing education per year to keep working in her role as a teacher at the preschool.

210.    There is no overlap between Plaintiff Sorcher's social work continuing-education classes and her continuing-education classes for OSSE, so she needs a total of 61 hours of continuing-education classes every year.

211.    OSSE's college requirement presents Plaintiff Sorcher with only four options: (1) go back to college to obtain 24 credit hours in an early-childhood field by December 2, 2023; (2) obtain a hardship waiver; (3) obtain an experience waiver; or (4) face the inevitable loss of her job.

212.    If Plaintiff Sorcher did not have a degree already, she would only need to obtain an associate's degree with a *major* in an early-childhood field. As shown above in paragraphs 147 and 152, Plaintiff Sorcher could obtain an associate's degree in an early-childhood field in the District and its metro area by taking *fewer* than 24 semester credit hours of early-childhood classes.

213.    Plaintiff Sorcher interprets OSSE's hardship waiver provision to mean that in order to qualify for a waiver, she would need to be taking steps to attend college now. This is because OSSE's regulations require her to make "diligent efforts" to comply with the day-care licensing regulations in order to receive a hardship waiver. D.C. Mun. Regs. tit. 5-A, §106.1(a).

214.    OSSE has provided no guidance to Plaintiff Sorcher about the "diligent efforts" she would need to take in order to apply for a hardship waiver.

215.    Plaintiff Sorcher does not wish to ask her current employer to apply for a hardship waiver on her behalf, because if she leaves her job, her waiver would not follow her.

216.    If Plaintiff Sorcher's current employer obtained a hardship waiver on her behalf, it would only apply to the facility, not to Plaintiff Sorcher herself.

217.    Plaintiff Sorcher does not want a hardship waiver that lets her work solely in one position with one employer for the rest of her career.

218.    Instead, she seeks the freedom to work anywhere in the child-care field for anyone.

219.    As a result, Plaintiff Sorcher has been taking steps to research her options for getting 24 hours of early-childhood college credits.

220.    Plaintiff Sorcher has spent hours since filing this lawsuit visiting websites for national and local colleges. She has identified and pored over pros and cons of many different programs, researched tuition costs, and drawn out timetables for various options.

221.    Among her options are Montgomery College and Northern Virginia Community College (NOVA).

222.    To take one three-hour course online at NOVA, it would cost Plaintiff Sorcher over $1,000.

223.    To take one three-hour course online at Montgomery College, it would cost Plaintiff Sorcher over $500 and require at least eight hours of classroom observation of children.

224.    Plaintiff Sorcher intends to keep trying to find a program that works for her, but she doubts she could sustain the requirements of the programs she has found so far.

225.    The effort of researching Plaintiff Sorcher's options has been exhausting, and she would like to stop doing it.

226.    Plaintiff Sorcher is not eligible for OSSE's ten-year experience waiver because her years of experience are not "continuous." She had only worked "continuously" at her position since 2010, a total of about six years, up until the Rulemaking went into effect on December 2, 2016.

227.    On June 30, 2017, Plaintiff Sorcher received an email from her director about OSSE's new regulations. This email laid out OSSE's new college requirement and expressed that it would adversely affect many of the preschool's staff.

228.    Soon after she received the email, Plaintiff Sorcher met with her director about OSSE's new regulations. Her director expressed the desire to retain Plaintiff Sorcher as a teacher and mistakenly reassured her that she would be able to apply for an experience waiver. Plaintiff Sorcher pointed out that she is ineligible for an experience waiver because her years of experience are not "continuous."

229.    Between her two jobs and annual professional development, Plaintiff Sorcher does not have time to go back to college.

230.    Plaintiff Sorcher does not need more education to take care of children competently and lovingly, as she has done continuously for the past eight years and for years before that during her previous job at the preschool.

231.    Parents trust Plaintiff Sorcher to care for their children competently and lovingly.

232.    Plaintiff Sorcher wishes to continue to follow her passion and work as a teacher at her preschool until she retires.

### **Plaintiff Jill Homan**

233.    Plaintiff Jill Homan lives in Petworth with her family. She owns a commercial real-estate investment firm.

234.    Plaintiff Homan and her partner have a three-year-old daughter and a one-year-old son.

235.    Plaintiff Homan and her partner work full time and need care for their children during the day.

236.    Since June 2017, Plaintiff Homan has taken her daughter to a day-care center in Northeast D.C. to spend full days each weekday. Since January 2019, her son has also attended the same day care.

237.    At the time this lawsuit was originally filed (April 26, 2018), Plaintiff Homan and her partner paid $1,700 per month for their daughter's day care.

238.    At the time this lawsuit was originally filed (April 26, 2018), Plaintiff Homan's friends in the District paid anywhere from $1,500 to $2,000 per month for day care.

239.    But now, Plaintiff Homan's day care has raised its prices. She and her partner pay $900 to $912 per week (approximately $3,600 per month) for day care for their daughter and son. This includes a discount for having two children in the day care.

240.    Plaintiff Homan and her partner work hard to make their budget work and spent a great deal of time researching and coming up with a child-care solution that met their family's needs.

241.    Plaintiff Homan did not have to spend time on a waitlist for a spot in her daughter's day care, but only because she paid a nonrefundable deposit of $2,575 for a spot in a new facility. Plaintiff Homan paid this deposit on September 24, 2016—almost two months before her daughter was born. The day care was supposed to open in January 2017 but did not open until June due to permitting delays.

242.    Plaintiff Homan trusts the director and staff of her children's day care and has been pleased with the care they have provided. The staff regularly gives Plaintiff Homan and her partner parenting tips.

243.    Plaintiff Homan is confident that her children are receiving exceptional care.

244.    Plaintiff Homan's children love their caregivers.

245.    Many of the staff at Plaintiff Homan's day care, including some who directly care for her children, do not have the college degree required by OSSE's new regulations.

246.    It does not make a difference to Plaintiff Homan whether the people who care for her children have a college degree. Rather, Plaintiff Homan prioritizes love, caring, patience, and attentiveness in her children's caregivers.

247.    OSSE's new regulations have worried Plaintiff Homan and other parents, because she is afraid that the caregivers she trusts will not be able to comply with the college requirement and will lose their jobs.

248.    In fact, two of Plaintiff Homan's favorite teachers left the day care to become nannies because they were not prepared to comply with the college requirement.

249.    Other teachers at Plaintiff Homan's day care have decided to retire early because of the college requirement or to become assistant teachers when the regulations take effect.

250.    Plaintiff Homan and other parents also worry that day-care providers who are exhausted, stressed, and overwhelmed by having to attend college, work full time, and care for their own families, will provide worse care than those who do not have to worry about attending school.

251.    Because they have already seen price increases since the rule was promulgated, Plaintiff Homan and other parents also worry that day care will continue to become more expensive under the college requirement.

## Injury to Plaintiffs

252.    The eventual implementation of the college requirement is inevitable.

253.    The inevitable implementation of the college requirement is causing Plaintiffs real harm today.

254.    Before OSSE enacted the college requirement, Plaintiffs Sanchez and Sorcher did not need a college degree to work at a day care.

255.    Because of the college requirement, Plaintiff Sanchez had to spend hours applying for an experience waiver that is purely discretionary and revocable at any time. She seeks retrospective relief in the form of nominal damages to compensate for this injury.

256.    Because of the college requirement, Plaintiff Sorcher's employer will be subject to fines and criminal penalties if it continues to employ her when the rule comes into effect.

257.    Plaintiff Sorcher has spent (and continues to spend) hours searching for college programs that would meet her scheduling needs in order to determine (among other things) how much money she would need to set aside for tuition. She seeks retrospective relief in the form of nominal damages to compensate for these injuries.

258.    If not for the college requirement, Plaintiff Homan would be paying less for day care for her children. She seeks retrospective relief in the form of nominal damages to compensate for this injury.

259.    If not for the college requirement, Plaintiff Homan would be free to choose caregivers who do not have a college degree.

260.    If not for the college requirement, Plaintiff Homan would not have to worry that her daughter's caregivers will be exhausted, stressed, and overwhelmed by attending school while working full time and taking care of their own families.

261.    OSSE's college requirement has caused, is causing, and will continue to cause ongoing and irreparable harm to Plaintiffs.

262.    A declaratory judgment in Plaintiffs' favor in this action would allow them to avoid these harms.

## CONSTITUTIONAL VIOLATIONS

### Count I
### (Article I, Section 8, clause 17 of the U.S. Constitution and the D.C. Home Rule Act: Unconstitutional Delegation)

263.    All preceding allegations are incorporated here as if set forth in full.

264.    The Constitution gives Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over [the District of Columbia]." U.S. Const. art. I, § 8, cl. 17.

265.    Congress's power to delegate its legislative authority is limited by the Constitution and the Administrative Procedure Act. *See* 5 U.S.C. § 706.

266.    Congress has delegated limited legislative power to the District's City Council under certain conditions explained below. Because its power comes from Congress, the D.C. City Council's authority to further delegate that power is subject to the same constitutional restraints as Congress's power to delegate.

267.    The D.C. City Council may not bypass the constitutional limits on its power to legislate by delegating unfettered authority to an administrative agency such as OSSE.

268.    In 1973, Congress enacted the District of Columbia Self-Government and Governmental Reorganization Act (the "D.C. Home Rule Act"). D.C. Code §§ 1-201.01–

1.207.71. The D.C. Home Rule Act delegated some, but not all, of Congress's legislative authority over the District to the D.C. City Council. *Id.* at § 1-203.02.

269.     The D.C. Home Rule Act places limits on the D.C. City Council's legislative authority. For example, Congress retains the ability to enact legislation for the District on any subject or repeal any act of the D.C. City Council. *Id.* at § 1-206.01. The D.C. City Council's acts are also subject to a 30-day congressional layover period. *See* D.C. Code § 1-206.02(c)(1).

270.     At the time OSSE promulgated the Rulemaking, the agency's rulemaking authority to enact day-care licensing regulations was not subject to any oversight from Congress.

271.     At the time OSSE promulgated the Rulemaking, the agency's rulemaking authority to enact day-care licensing regulations was not subject to any oversight from the D.C. City Council.

272.     The Rulemaking is not subject to judicial review under the D.C. Administrative Procedure Act. There is no means by which a court may determine whether, at the time of the Rulemaking, OSSE was regulating without an intelligible principle, arbitrarily and capriciously, contrary to constitutional right, or contrary to substantial evidence.

273.     Article I, Section 8, clause 17 of the Constitution and the D.C. Home Rule Act prohibit the D.C. City Council from delegating complete, unreviewable legislative discretion to administrative agencies.

274.     OSSE exercised complete, unreviewable legislative discretion in promulgating the Rulemaking because it was not subject to oversight from the D.C. City Council, and the Rulemaking cannot be reviewed by a court to determine whether OSSE was regulating without an intelligible principle, arbitrarily and capriciously, contrary to constitutional right, or contrary to substantial evidence.

275.    Therefore, OSSE's December 2, 2016 Final Rulemaking is invalid under Article I, Section 8, clause 17 of the U.S. Constitution and the D.C. Home Rule Act.

## Count II
### (Fifth Amendment to the U.S. Constitution: Due Process)

276.    All preceding allegations are incorporated here as if set forth in full.

277.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution protects Plaintiffs Sanchez's and Sorcher's right to pursue an honest living free from arbitrary and irrational regulations and Plaintiff Homan's right to make responsible decisions about whom to trust to care for her child. The Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

278.    The District's college requirement for day-care providers—specifically, D.C. Mun. Regs. tit. 5-A, §§ 165 and 170—does not further any valid public health or safety purpose, and therefore violates Plaintiffs' right to due process of law on its face and as applied.

279.    There is no rational basis for prohibiting someone from working in a day care because she does not have a college degree.

280.    Unless Defendants are enjoined from enforcing the college requirement for day-care providers, Plaintiffs will continue to suffer great and irreparable harm.

## Count III
### (Fifth Amendment to the U.S. Constitution: Equal Protection)

281.    All preceding allegations are incorporated here as if set forth in full.

282.    The Fourteenth Amendment to the U.S. Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Due Process Clause of the Fifth Amendment also guarantees equal protection. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

283.    The Rulemaking draws an arbitrary and irrational distinction between day-care providers, who are required to work for a licensed facility and to obtain a college degree to care for children, and other kinds of child-care providers, such as nannies, who are allowed to care for children without being licensed or obtaining a college degree.

284.    The District's college requirement for day-care center teachers—specifically, D.C. Mun. Regs. tit. 5-A, § 165—draws an arbitrary and irrational distinction between private, parochial, and independent schools with full-time elementary or secondary education programs with day cares attached, which are exempt from the requirement, D.C. Mun. Regs. tit. 5-A, § 165.6; and private, parochial, and independent schools with attached day cares (such as Plaintiff Sorcher's synagogue) that serve elementary and secondary-school age children in other capacities. Moreover, private schools with full-time pre-Kindergarten through 12th-grade programs are exempt from day-care licensing altogether under D.C. Mun. Regs. tit. 5-A, § 101.5(l).

285.    If Plaintiff Sorcher's synagogue served the same elementary- and secondary-school-age children full time, the day care would be exempt from licensure and from OSSE's college requirement.

286.    The District's college requirement for day-care center teachers—specifically, D.C. Mun. Regs. tit. 5-A, § 165—also draws an arbitrary and irrational distinction between day-care center teachers who already have a college degree and those who do not. Day-care center teachers who *already have* a college degree in a major other than an early-childhood field (such as Plaintiff Sorcher) must obtain *at least 24* semester credit hours in an early-childhood field. Day-care center teachers who do *not* have a degree must obtain an associate's degree with a *major* in an early-childhood field, which may require *less than 24* semester credit hours of early-

40

-47-

childhood classes. The Rulemaking requires *more* early-childhood courses for day-care providers *who already have college degrees* than for those who do not.

287.    There is no rational basis for prohibiting someone from working in a day care because she does not have a college degree.

288.    Unless Defendants are enjoined from enforcing the college requirement for day-care providers, Plaintiffs will continue to suffer great and irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request relief as follows:

A.    A declaratory judgment that OSSE's December 2, 2016 Final Rulemaking violates Article I, Section 8, clause 17 of the U.S. Constitution;

B.    A declaratory judgment that OSSE's December 2, 2016 Final Rulemaking violates the D.C. Home Rule Act;

C.    A declaratory judgment that sections 165 and 170 of Chapter 1, Child Development Facilities: Licensing, of Title 5-A of the District of Columbia Municipal Regulations, D.C. Mun. Regs. tit. 5-A, §§ 165 & 170, violate Plaintiffs' right to due process under the Fifth Amendment to the U.S. Constitution;

D.    A declaratory judgment that OSSE's December 2, 2016 Final Rulemaking violates Plaintiffs' right to equal protection of the laws under the Fifth Amendment to the U.S. Constitution;

E.    A declaratory judgment that sections 165 and 170 of Chapter 1, Child Development Facilities: Licensing, of Title 5-A of the District of Columbia Municipal Regulations, D.C. Mun. Regs. tit. 5-A, §§ 165 & 170, violate Plaintiffs' right to equal protection of the laws under the Fifth Amendment to the U.S. Constitution;

F.      A permanent injunction enjoining Defendants and their officers, employees, or

agents from implementing, applying, or taking any action whatsoever pursuant to OSSE's

December 2, 2016 Final Rulemaking and D.C. Mun. Regs. tit. 5-A, §§ 165 and 170;

G.      An award of nominal damages in the amount of $1 to each Plaintiff;

H.      An award of attorneys' fees, costs, and expenses in this action pursuant to 42

U.S.C. § 1988; and

I.      All further legal and equitable relief as the Court may deem just and proper.

RESPECTFULLY SUBMITTED this 30th day of July, 2020.

/s/ *Renée D. Flaherty*
Renée D. Flaherty (DC Bar No. 1011453)
Robert McNamara (VA Bar No. 73208)
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Telephone:  (703) 682-9320
Facsimile:  (703) 682-9321
Email:  rflaherty@ij.org; rmcnamara@ij.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALTAGRACIA SANCHEZ, *et al.*,             :
                                          :
    Plaintiffs,                           :       Civil Action No.:     18-975 (RC)
                                          :
    v.                                    :       Re Document Nos.:    32, 33
                                          :
OFFICE OF THE STATE                       :
SUPERINTENDENT OF EDUCATION, *et al.*,    :
                                          :
    Defendants.                           :

### ORDER

### GRANTING DEFENDANTS' MOTION TO DISMISS

For the reasons stated in the Court's Memorandum Opinion separately and

contemporaneously issued, Defendants' motion to dismiss (ECF No. 33) is **GRANTED**.

Plaintiffs' motion for discovery notwithstanding the motion to dismiss (ECF No. 32) is **DENIED**

**AS MOOT**.

    **SO ORDERED**.


Dated:  January 13, 2021                              RUDOLPH CONTRERAS
                                                      United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| ALTAGRACIA SANCHEZ, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 18-975 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 32, 33 |
| | : | | |
| OFFICE OF THE STATE | : | | |
| SUPERINTENDENT OF EDUCATION, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**<u>MEMORANDUM OPINION</u>**

**G<small>RANTING</small> D<small>EFENDANTS</small>' M<small>OTION TO</small> D<small>ISMISS</small>**

**I.  INTRODUCTION**

This case involves regulations promulgated by the D.C. Office of the State
Superintendent of Education ("OSSE") that impose minimum education requirements on certain
childcare providers that operate in the District of Columbia.  Plaintiffs, two childcare providers
and one parent, argue that the regulations resulted from an unconstitutional delegation of power
and that they violate the Due Process and Equal Protection Clauses of the U.S. Constitution.
Defendants have moved to dismiss Plaintiffs' claims.  This Court previously considered a motion
to dismiss but ruled that Plaintiffs' failed to overcome several jurisdictional hurdles.  Plaintiffs
appealed and the D.C. Circuit reversed and remanded for consideration of the merits of
Plaintiffs' allegations.  *See Sanchez v. Off. of the State Superintendent of Educ.*, 959 F.3d 1121
(D.C. Cir. 2020).  Defendants now argue that, accepting as true the factual allegations in the
Amended Complaint, Plaintiffs have failed to state a plausible claim to relief.  For the reasons set
forth below, the Court agrees and, therefore, grants Defendants' motion to dismiss.

## II.  BACKGROUND

### A.  Statutory and Regulatory Framework

The Child Development Facilities Regulation Act of 1998 ("Facilities Act"), D.C. Law

12-215, 46 D.C. Reg. 274 (1999) (codified as amended at D.C. Code § 7-2031 *et seq.*), requires

certain childcare providers in the District of Columbia to obtain a license to operate, *see* D.C.

Code § 7-2034(a).  The Facilities Act delegates rulemaking power to the Mayor to promulgate

"all rules necessary to implement the provisions of" the Facilities Act.  *Id.* § 7-2036(a)(1).  The

delegation of authority requires that the Mayor set "[m]inimum standards of operation of a child

development facility concerning staff qualification, requirements and training, facility size, staff-

child ratios and group size, program design and equipment requirements, safety and health

standards, care for children with special needs, nutrition standards, and record keeping

requirements."  *Id.* § 7-2036(a)(1)(A).  The Facilities Act defines "child development facility" as

"a center, home, or other structure that provides care and other services, supervision, and

guidance for children, infants, and toddlers on a regular basis, regardless of its designated name."

*Id.* § 7-2031(3).  The Facilities Act specifically exempts from its requirements babysitters,

informal playgroups, parent-led play cooperatives, childcare furnished in places of worship

during religious services, care provided by relatives, childcare provided by the federal

government, and certain pre-kindergarten education programs.  *Id.* § 7-2033.  The Mayor has

delegated the rulemaking power under the Facilities Act to OSSE.  *See* Mayor's Order 2009-130,

56 D.C. Reg. 6883 (July 16, 2009).

Pursuant to this authority, OSSE issued regulations that set minimum education

requirements for childcare staff at child development facilities.  *See generally* D.C. Mun. Regs.

tit. 5-A1, §§ 100–99.  Under the regulations, teachers at childcare development centers, located

on premises other than a dwelling that serve more than twelve children, must obtain at least an associate's degree from an accredited college "with a major in early childhood education, early childhood development, child and family studies, or a closely related field." *Id.* § 165.1. Caregivers in an expanded child development home, which is a facility located in a private residence where two or more caregivers oversee up to twelve children, must obtain the same. *Id.* § 170.2. The requirements did not become immediately binding; when initially promulgated, the regulations generally provided a grace period of anywhere between three and six years. *See, e.g.*, 63 D.C. Reg. 14,786, 14,799 (original versions of D.C. Mun. Regs. tit. 5-A1, §§ 164.1(b), (c) and 170.2(a)(1)(2)).[1] The regulations also provided that OSSE could waive compliance with any of the education requirements if presented with clear and convincing evidence that (1) "[t]he demonstrated . . . economic impact or hardship on the Facility or staff member [was] sufficiently great to make immediate compliance impractical despite diligent efforts;" (2) "[t]he facility or staff member [was] meeting or exceeding the intent of the regulation for which the waiver [was] requested; and" (3) "[t]he health and welfare of staff and children [we]re not jeopardized." D.C. Mun. Regs. tit. 5A-1, § 106.1. OSSE provided for another exemption for certain staff positions for individuals who had, as of December 2016, "continuously served" in the relevant staff position for ten or more years. *Id.* §§ 165.4, 170.2.

The regulations make three distinctions relevant to the current case. First, the regulations, like the Facilities Act, specifically exempt certain childcare providers, such as babysitters and nannies, from the degree requirements. *Id.* § 101.5. Second, the regulations

---

[1] In June 2018, OSSE amended its regulations to allow more time to comply with the degree requirements. 65 D.C. Reg. 7034–7036 (June 29, 2018); *see also* D.C. Mun. Regs. tit. 5-A1 §§ 165.1(d), 170.2(a)(2). The deadline for compliance relevant to this case is now December 2023. *See* D.C. Mun. Regs. tit. 5-A1 §§ 165.1(d), 170.2(a)(2).

specifically exempt private schools that provide "education services to children in grades pre-K-through twelfth (12th) grade during [] a full school day." *Id.* § 101.5(l).  Under this exemption, private, parochial, or independent schools that have full-time elementary or secondary educational programs in addition to infant and toddler care on the same premises need not comply with the minimum degree requirements.  *See id.* § 165.6.  Third, teachers at childhood development centers who already possess a college degree in a major other than an early childhood field must obtain at least twenty-four credit hours of college coursework in an early childhood field.  *Id.* § 165.1.

### B.  Factual and Procedural Background

Plaintiff Altagarcia Sanchez is subject to the new education requirements as an "expanded home caregiver."  *See generally id.* §§ 169–71.  She runs a licensed daycare out of her house and currently cares for nine children.  *See* Am. Compl. ¶ 164, ECF No. 31.  Although she carries a doctoral degree in law from her home country, *id.* ¶ 157, she never attended college in the United States, *id.* ¶ 159.  Plaintiffs allege that, given the demands of her work schedule, it would take Ms. Sanchez at least five years to complete the degree requirements as a part-time student, which they estimate would require around sixty credit hours.  *See id.* ¶¶ 170–75.  However, Plaintiffs allege that Ms. Sanchez cannot afford to attend college, even part-time.  *Id.* ¶¶ 180–83.  Ms. Sanchez received a waiver to the degree requirement in April 2019, but she fears that OSSE may revoke the waiver at some point in the future.  *Id.* ¶¶ 190–91.

Plaintiff Dale Sorcher is what the regulations refer to as a teacher at a child development center.  *See* D.C. Mun. Regs. tit. 5A-1, § 165.  Ms. Sorcher teaches children ages zero to three at a Jewish preschool attached to the synagogue she attends.  Am. Compl. ¶¶ 193–95.  Although Ms. Sorcher has two master's degrees and a bachelor's degree, she does not have the requisite

education in early childhood education called for by the regulations. *Id.* ¶¶ 192, 211–12. The synagogue does have educational programs for elementary and secondary students but does not offer full-time educational programs. *Id.* ¶ 197. Plaintiffs allege that Ms. Sorcher is not eligible for a waiver of the degree requirement, *id.* ¶ 226, and that she does not have time to go back to college, *id.* ¶ 229. Furthermore, Plaintiffs maintain that Ms. Sorcher does not need more education in order to competently do her job. *Id.* ¶ 230.

Plaintiff Jill Homan is a parent whose young daughter attends a licensed daycare center subject to the regulations. *Id.* ¶¶ 234, 245–50. Ms. Homan is "afraid that the caregivers she trusts will not be able to comply with the college requirement and will lose their jobs." *Id.* ¶ 247. She worries that daycare providers forced to attend college in addition to their work duties will be "exhausted, stressed, and overwhelmed" and "will provide worse care than those who do not have to worry about attending school." *Id.* ¶ 250. She also believes that "day care will continue to become more expensive under the college requirement." *Id.* ¶ 251.

Plaintiffs bring three counts against the District of Columbia and OSSE (together "Defendants") related to the OSSE regulations. First, Plaintiffs argue that the Facilities Act's delegation of authority to the Mayor to promulgate minimum educational standards violates the District of Columbia Self-Government and Governmental Reorganization Act (the "D.C. Home Rule Act"), D.C. Code §§ 1-201.01– 1.207.71, and the U.S. Constitution's nondelegation doctrine. *Id.* ¶¶ 263–75. Second, Plaintiffs claim that the OSSE regulations violate their Fifth Amendment Due Process rights because "[t]here is no rational basis for prohibiting someone from working in a day care because she does not have a college degree." *Id.* ¶ 279. Finally, Plaintiffs argue that the OSSE regulations draw arbitrary and irrational distinctions between

different types of day-care providers and facilities, which they maintain violates the Equal

Protection Clause. *Id.* ¶¶ 281–88.

This Court previously considered a motion to dismiss Plaintiffs' Compliant. *See Sanchez*

*v. Off. of State Superintendent of Educ.*, No. 18-cv-975, 2019 WL 935330 (D.D.C. Feb. 26,

2019). The Court dismissed all of Plaintiffs' claims on threshold, jurisdictional grounds. *See id.*

at *5–6 (dismissing Ms. Homan's claims for lack of standing); *id.* at 6–9 (dismissing other

claims as moot and unripe). The Court thus declined to consider the merits of Plaintiffs'

challenges under the nondelegation doctrine, the Due Process Clause, and the Equal Protection

Clause. Plaintiffs appealed. Finding that the doctrines of mootness and ripeness did not bar any

of Plaintiffs' claims, the D.C. Circuit determined that Plaintiffs' purely legal challenges are

presumptively reviewable. *See Sanchez*, 959 F.3d at 1124–26. The court reversed and remanded

for consideration of the merits of Plaintiffs' claims, finding that the claims are justiciable. *See*

*id.* at 1123.

After remand, Plaintiffs' filed an Amended Complaint. *See* Am. Compl. Defendants'

motion to dismiss argues that, even accepting the factual allegations as true, Plaintiffs fail to state

a plausible claim to relief with respect to each count in the Amended Complaint. *See* Defs.' Mot.

Dismiss ("Defs.' Mot."), ECF No. 33. In addition to the motion to dismiss, Plaintiffs filed a

motion for discovery notwithstanding the pending motion to dismiss. *See* Pls.' Mot.

Notwithstanding Mot. Dismiss, ECF No. 32. Plaintiffs' motion argues that the Court should

permit limited discovery despite the pending motion to dismiss. *See id.* at 1–3. Both motions are

ripe for decision.

### III.  LEGAL STANDARD

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests.  Fed. R. Civ. P. 8(a)(2); *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).  A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  The complaint's factual allegations are to be taken as true, and the court is to construe them liberally in the plaintiff's favor.  *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).  Notwithstanding this liberal construal, the court deciding a Rule 12 motion must parse the complaint for "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This plausibility requirement means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555–56 (citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.

### IV.  ANALYSIS

As explained above, Plaintiffs bring three claims against Defendants.  First, Plaintiffs argue that the rulemaking provision of the Facilities Act is an impermissible delegation of

legislative power in violation of the D.C. Home Rule Act and the U.S. Constitution.  Second,

Plaintiffs argue that the OSSE regulations violate Plaintiffs' substantive due process rights

guaranteed by the Fifth Amendment.  Third, Plaintiffs argue that the OSSE regulations violate

the equal protection clause by making arbitrary and irrational distinctions.  Defendants argue that

Plaintiffs have failed to allege sufficient facts to withstand a motion to dismiss with respect to

each claim.[2]  The Court addresses each claim in turn.

### A.  Nondelegation Doctrine Claim

Article I of the Constitution states that "[a]ll legislative Powers herein granted shall be

vested in a Congress of the United States."  U.S. Const. art I, § 1.  "This text permits no

delegation of those powers."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).  As

such, "[i]n a nondelegation challenge, the test is whether Congress has set forth 'an intelligible

principle to which the person or body authorized to act is directed to conform.'"  *TOMAC,*

*Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 866 (D.C. Cir. 2006) (quoting

*Whitman*, 531 U.S. at 472 (alterations and internal quotations omitted)).  To determine the

boundaries of a delegation, courts look to the statutory language, the purpose of the statute, its

factual background, and the statutory context.  *Michigan Gambling Opposition v. Kempthorne*,

525 F.3d 23, 30 (D.C. Cir. 2008) (citing *TOMAC*, 433 F.3d at 866 (quoting *Am. Power & Light*

*Co. v. SEC*, 329 U.S. 90, 104 (1946)).  "[T]he degree of agency discretion that is acceptable

varies according to the scope of the power congressionally conferred."  *Whitman*, 531 U.S. at

475.  Although broad delegations of power may require "substantial guidance," relatively narrow

delegations of power need not be accompanied by explicit direction or any direction at all.  *Id.*

---

[2] Defendants also argue that Ms. Homan lacks standing, *see* Defs.' Mot. at 35–36, and
that OSSE should be dismissed as a defendant, *see id.* at 36.  Because the Court has determined
that Plaintiffs have failed to state a claim, it will not address these arguments.

(noting that Congress need not provide direction to EPA to define "country elevators" but must provide "substantial guidance on setting air standards that affect the entire national economy"). Though the D.C. Court of Appeals has not held that the nondelegation doctrine applies to the District's government, both parties apparently agree that it applies by application of the Home Rule Act.  *See* Defs.' Mot. at 14–15; Pls.' Opp'n at 14, ECF No. 34 ; *see also Unum Life Ins. Co. of Am. v. District of Columbia*, 238 A.3d 222, 232 (D.C. 2020) (assuming without deciding applicability of nondelegation doctrine and applying Supreme Court precedent to resolve issue). For purposes of the present motion to dismiss, the Court assumes the applicability of the nondelegation doctrine to delegations by the District Council to District agencies.

Defendants argue that the delegation of authority in the Facilities Act contains an intelligible principle "to establish minimum qualifications that are appropriate *given the nature of the job to which [childcare providers] apply*."  Defs.' Mot. at 19.  Defendants first note that "the standards for any permissible delegation 'are not demanding,'" *id.* at 16 (quoting *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality op.)), and that the Supreme Court has consistently upheld even broad delegations of authority, *see id.*  Defendants argue that the Facilities Act instructs the Mayor[3] "as to the limits of [her] authority (that [she] may set 'minimum standards of operation') as well as the targets (child development facilities) and content (staff qualification, requirements and training) of any regulations."  *Id.* at 17 (quoting D.C. Code § 7-2036(a)(1)).  Defendants point to a variety of similar delegations of authority to set minimum education or training standards that contain virtually the same level of direction. *See id.* at 18 (discussing similar delegations to the Transportation Security Administration, the

---

[3] The District actually states that the Facilities Act "instructs OSSE," *id.* at 17, but the statutory delegation of authority grants rulemaking authority to the Mayor, *see* D.C. Code § 7-2036(a)(1).

Department of Homeland Security, the Treasury Secretary, and the Secretary of the Interior).

Finally, Defendants argue that Plaintiffs offer no legal support for their argument that some

stricter scrutiny should be required because the D.C. Administrative Procedure Act ("DCAPA"),

D.C. Code § 2-510, does not provide for judicial review of rulemakings. *See id.* at 19–22 (citing

Am. Compl. ¶¶ 270–74, 95). Defendants claim that "whether (or to what extent) the delegee's

actions are subject to judicial review" does not change the nondelegation doctrine analysis. *Id.* at

19–20 (citing *Michigan Gambling Opposition*, 525 F.3d at 33 n.8). In any event, Defendants

challenge Plaintiffs' underlying premise and argue that rulemakings by D.C. agencies can, in

fact, be reviewed by the D.C. Superior Court. *See id.* at 20 (citing *District of Columbia v. Sierra*

*Club*, 670 A.2d 354, 359 (D.C. 1996)).

 In opposition, Plaintiffs claim that the delegation of authority in the Facilities Act does

not contain an intelligible principle. Pls.' Opp'n at 15–17. This is so, they claim, because the

Facilities Act allows free range for the Mayor to "set any standard [she] likes" without regard to

any limiting principles. *Id.* at 16. Plaintiffs claim that under the language of the Facilities Act,

the Mayor could forbid college degrees, require a Ph.D., or demand compliance with physical

tests. *See id.* Plaintiffs maintain that the Mayor's authority to set minimum standards of

operation at child development facilities under the Facilities Act equals the authority of the

legislature itself. *Id.* With respect to the statutory delegations that authorize agencies to set

minimum qualifications in other contexts, Plaintiffs say that the Court should treat those

differently because they are subject to judicial review under the Administrative Procedure Act.

*Id.* at 17–18. According to Plaintiffs, nothing could be done if the Mayor or OSSE required

childcare providers to become, for example, certified public accountants because the DCAPA

does not allow for judicial review of rulemakings. *Id.* The Court understands Plaintiffs to argue

that because the DCAPA limits judicial review to "contested cases"—in other words, adjudications—the delegation of authority should be struck down even if the statute contains an intelligible principle. *See id.* ("Therefore, even if OSSE's statute had ordered it to pursue an intelligible principle, there was no mechanism by which a court could determine that is was failing to actually do so or was acting arbitrarily, capriciously, or without substantial evidence."); *id.* at 20 ("For nondelegation purposes, what matters is whether there is any authority ensuring that an agency's exercise of its delegated legislative power is not arbitrary or capricious." (footnote omitted)).

The Court agrees with Defendants; the delegation of power in D.C. Code § 7-2036 does not amount to an unconstitutional delegation of legislative power. The text of the statute and broader statutory context make clear an intelligible principle to guide the delegated authority. First, the text cabins the delegated power to "rules necessary to implement the provisions *of this subchapter*," which is titled "Child Development Facilities Regulation." D.C. Code § 7-2036(a)(1) (emphasis added). Second, the text limits the Mayor's authority to a specific population and subject. The Facilities Act states that the Mayor shall set "[m]inimum standards of operation of a child development facility concerning staff qualification, requirements and training." *Id.* § 7-2036(a)(1)(A). The "minimum standards of operation" must relate to "child development facilit[ies]" and must speak to "staff qualification, requirements and training." *Id.* Third, the statutory definition of "child development facility" further guides the Mayor in setting appropriate minimum standards of operation. A child development facility "means a center, home, or other structure that *provides care and other services, supervision, and guidance for children, infants, and toddlers* on a regular basis." *Id.* § 7-2031(3) (emphasis added). Plainly, the minimum standards of operation set by the Mayor must be directed at care, supervision, and

guidance for children, infants, and toddlers.  The narrow scope of this delegation of power does not require further direction or guidance.  *See Whitman*, 531 U.S. at 475.  The Mayor's delegated authority is "cabined by 'intelligible principles' delineating both the area in and the purpose for which" the minimum operating standards should apply.  *TOMAC*, 433 F.3d at 867.

The Court rejects Plaintiffs' contention that some other standard should apply because the DCAPA does not provide for judicial review of D.C. agency rulemaking.  Plaintiffs apparently contend that even with an intelligible principle to guide the delegation of power the delegation should be struck down because the DCAPA only allows for review of "contested cases."  *See* Pls.' Opp'n at 18; *see also* D.C. Code § 2-510(a).  But Plaintiffs cite no cases for the novel contention that delegations of power to D.C. agencies are per se unconstitutional or in violation of the D.C. Home Rule Act because of the gap in the DCAPA.  Moreover, the Court agrees with Defendants that caselaw supports the contention that D.C. agency rulemakings are reviewable. *See District of Columbia v. Sierra Club*, 670 A.2d 354, 359 (D.C. 1996) ("The availability of review by this court of agency decisions in 'contested cases' . . . does not preclude judicial review of other matters, because any party aggrieved by an agency's decision may initiate an appropriate equitable action in the Superior Court to seek redress." (internal alterations and quotations omitted)); *D.C. Hosp. Ass'n v. Barry*, 586 A.2d 686, 690–94 (D.C. 1991) (upholding D.C. Superior Court decision that found D.C. regulations were not arbitrary and capricious); *Capitol Hill Restoration Soc'y, Inc. v. Moore*, 410 A.2d 184, 188 (D.C. 1979) ("[W]e are not foreclosing all review . . . in other noncontested matters . . . .  Any party aggrieved by an agency's decision may initiate an appropriate equitable action in the Superior Court to seek redress."); *Dupont Circle Citizen's Ass'n v. D.C. Zoning Comm'n*, 343 A.2d 296, 308 (D.C. 1975) (en banc) (J. Gallagher concurring) (stating that a party will "always have access to the

12

**-62-**

trial court for review in an original proceeding" and can argue "that the agency action was

arbitrary and capricious").  In any event, whether or not the Mayor's actions pursuant to the

Facilities Act might be unreviewable does not control the nondelegation doctrine analysis.  *See*

*Michigan Gambling Opposition*, 525 F.3d at 33 n.8.[4]

Because the Facilities Act contains an intelligible principle to guide the Mayor's

rulemaking authority, the Court finds that Plaintiffs have failed to state a plausible claim to relief

with respect to their nondelegation challenge.

**B.  Due Process Claim**

The Fifth Amendment to the U.S. Constitution provides that no person shall "be deprived

of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  Plaintiffs claim

that the degree requirement contained in OSSE's regulations "does not further any valid public

health or safety purpose, and therefore violates Plaintiffs' right to due process of law on its face

and as applied."  Am. Compl. ¶ 278.  The government may infringe upon a fundamental liberty

or property interest "only if the infringement is 'narrowly tailored to serve a compelling state

interest."  *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 330 F.3d 513, 523 (D.C. Cir.

2003) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).  Where no fundamental liberty or

property interest is at stake, "the Fifth Amendment requires only a rational basis."  *Id.* (citing

_____

[4] Plaintiffs argue that *Michigan Gambling Opposition* does not support the proposition
that the nondelegation doctrine analysis is unaffected by reviewability.  *See* Pls.' Opp'n at 21.
The court in *Michigan Gambling Opposition* stated "[n]or are we concerned, for purposes of the
non-delegation doctrine, that the Secretary's decision . . . might be unreviewable in a court of
law . . . [the statute] intelligibly guides the Secretary's exercise of discretion, and that is all that
the non-delegation doctrine requires."  525 F.3d at 33 n.8.  The Court understands this to mean
that whether an agency's actions are reviewable does not change the nondelegation doctrine
analysis.  But even assuming *arguendo* that Plaintiffs could potentially win this point, they fail to
cite any precedent that suggests that the nondelegation doctrine analysis should change if agency
action is not subject to judicial review.  Nor do they cite any precedent explaining how the
analysis should change.

*FCC v. Beach Commc'ns Inc.*, 508 U.S. 307, 313 (1993); *Waters v. Rumsfeld*, 320 F.3d 265, 268 (D.C. Cir. 2003). Under rational basis review, to survive a motion to dismiss, a plaintiff must plead "facts that establish that there is not 'any reasonable conceivable state of facts that could provide a rational basis for the classification.'" *Hettinga v. United States*, 677 F.3d 471, 479 (D.C. Cir. 2012) (quoting *Dumaguin v. Sec'y of Health and Hum. Servs.*, 28 F.3d 1218, 1222 (D.C. Cir. 1994)); *see also Am. Fed'n*, 330 F.3d at 523 (applying same standard for rational basis review to substantive due process and equal protection challenges).

Defendants argue that Plaintiffs cannot overcome the deferential standard under a rational basis review. Defs.' Mot. at 23. Defendants state that the "rational relationship here is no more than that involved in requiring a science teacher to have science degree, an accountant to have an accounting degree, or a lawyer to have a law degree." *Id.* at 24. Defendants say that questioning whether the regulations will actually improve childcare, or whether some childcare workers will be unable to comply, or whether the data underlying OSSE's action actually supports the regulations does not change the deferential analysis. *See id.* at 24–29. In opposition, Plaintiffs point to a number of cases in other contexts where courts have struck down statutes after a rational basis review. *See* Pls.' Opp'n at 29–30. Plaintiffs say that here, the degree requirements in the regulations do "absolutely *nothing* to further" the legitimate government interest of promoting optimal childcare outcomes. *Id.* at 30 (emphasis in original). Plaintiffs argue that they should be entitled to develop a record to show that the degree requirements are unrelated to OSSE's purpose. *Id.* at 31. Defendants argue in reply that whether there is a rational basis for the regulations is a legal conclusion and that Plaintiffs cannot allege facts that survive a motion to dismiss in this case because "one could at least rationally speculate that requiring more advanced education would yield improved child care." Defs.' Reply at 16–17, ECF No. 37.

The Court finds that Plaintiffs have failed to state a plausible claim to relief under the Due Process Clause.  The Court agrees with Defendants that "OSSE's regulations are plainly 'rational on [their] face.'"  *Id.* at 17 (quoting *Hettinga*, 677 F.3d at 479).  The regulations require individuals who will be caring for children, infants, and toddlers to take classes or obtain a degree in "early childhood education, early childhood development, child and family studies, or a closely related field."  D.C. Mun. Regs. tit. 5A-1, § 165.1.  A conceivable rational basis for the regulations is readily apparent: more early childhood education for childcare providers will lead to better childcare.  Given this plausible reason for the government action, the "inquiry is at an end."  *Beach Commc'ns*, 508 U.S. at 314 (quoting *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)).  Even if Plaintiffs have data showing that the degree requirements at issue will not make for better childcare, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."  *Id.* at 315.[5]  It is rational to determine that the degree requirements in OSSE's regulations could improve early childhood care in the District of Columbia.  Plaintiffs have failed to "plead facts that establish that there is not 'any reasonable conceivable state of facts that could provide a rational basis for the classification.'"  *Hettinga*, 677 F.3d at 479 (quoting *Dumaguin*, 28 F.3d at 1222).  Accordingly, Plaintiffs fail to state a plausible claim under the Due Process Clause.

### C.  Equal Protection Claim

The Fourteenth Amendment to the U.S. Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.

---

[5] For this reason, the parties' discussion of a 2015 report by the National Academies of Sciences is irrelevant.  *See* Defs.' Mot. at 26–29; Pls.' Opp'n at 32–33.  Whether the report supports or does not support the regulations does not change the "strong presumption of validity" afforded to laws under rational basis review.  *Beach Commc'ns*, 508 U.S. at 314.

Plaintiffs' equal protection claim alleges that OSSE's rules draw arbitrary distinctions with respect to the degree requirement. *See* Am. Compl. ¶¶ 283–88. Such distinctions are subject to rational basis review. *See Gebresalassie v. District of Columbia*, 170 F. Supp. 3d 52, 60 (D.D.C. 2016). "A statutory classification that 'neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Hettinga*, 677 F.3d at 478 (quoting *Beach Commc'ns*, 508 U.S. at 313). Like rational basis review of due process claims, at the motion to dismiss stage, an equal protection challenge to a statute that does not involve a classification along suspect lines or fundamental rights—like the challenge here—requires overcoming a "strong presumption of validity," *Tate v. District of Columbia*, 627 F.3d 904, 910 (D.C. Cir. 2010), by "plead[ing] facts that establish that there is not 'any reasonable conceivable state of facts that could provide a rational basis for the classification,'" *Hettinga*, 677 F.3d at 479 (quoting *Dumaguin*, 28 F.3d at 1222). Again, like with a due process challenge, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315.

Plaintiffs challenge three distinctions made in the OSSE regulations on equal protection grounds. *See* Am. Compl. ¶¶ 283–286. First, Plaintiffs argue that the regulations draw "an arbitrary and irrational distinction between day-care providers . . . and other kinds of child-care providers, such as nannies" *Id.* ¶ 283. Second, Plaintiffs argue that the regulations draw "an arbitrary and irrational distinction between private, parochial, and independent schools with full-time elementary or secondary education programs with day cares attached . . . and private, parochial, and independent schools with attached day cares . . . that serve elementary and

secondary-school age children in other capacities." *Id.* ¶ 284.  Third, Plaintiffs argue that the

regulations draw "an arbitrary and irrational distinction between day-care center teachers who

already have a college degree and those who do not." *Id.* ¶ 286.  Day-care center teachers who

already have a college degree "must obtain *at least 24* semester credit hours in an early-

childhood field" whereas those "who do *not* have a degree must obtain an associate's degree

with a *major* in an early-childhood field, which may require *less than 24* semester credit hours."

*Id.*  Plaintiffs argue that none of these distinctions rationally relate to a legitimate government

purpose.  *See* Pls.' Opp'n at 24–28.

     The District argues that the three distinctions Plaintiffs point to all survive rational basis

scrutiny.  Defs.' Mot. at 30–35.  The District suggests that distinguishing between day-care

teachers and other child care workers—such as babysitters, nannies, and parent-supervised play

groups—makes sense because the other child care workers, who are exempt from the degree

requirement, do not usually care for three or more unrelated children.  *Id.* at 31.  Furthermore, the

District argues that these other child care workers are not performing the same type of work as a

teacher at a child development center, so the distinction is rational.  Defs.' Reply at 10.  Treating

schools with full-time elementary and secondary programs differently than schools that only

offer part time programs also makes sense, the District says, because OSSE could have

reasonably concluded that day cares attached to full-time elementary or secondary schools are

already more likely to have staff with relevant college degrees.  Defs.' Mot. at 33.  Finally, the

District argues that treating child development center teachers who already have college degrees

differently than teachers who do not have a degree also has a plausible rational basis.  *Id.* at 34–

35.  The regulations require teachers who already have college degrees in a non-early-childhood

field to earn twenty-four credit hours in early childhood studies.  *See id.*  The District contends

that the twenty-four-credit hour requirement is an appropriate approximation even though there may be some degree programs that require more or fewer credits. *Id.* at 34–35 (citing *Beach Commc'ns*, 508 U.S. at 316 n.7 ("The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." (quoting *Metropolis Theatre Co. v. Chicago*, 288 U.S. 61, 69–70 (1913)).

The Court finds that Plaintiffs have failed to plead sufficient facts to state a plausible equal protection claim with respect to each distinction. The Court agrees with Defendants that each distinction survives a rational basis review. First, distinguishing between child development facility employees and other childcare givers, like nannies and babysitters, makes sense. The Court agrees with Defendants that these other caregivers have a different set of demands on their time, usually care for smaller numbers of children, and are generally individually selected by parents. *See* Defs.' Reply at 10–11. It is completely rational to exempt more informal childcare from the degree and licensure requirements precisely because they are more informal. It would also be rational for OSSE to conclude that the other types of caregivers perform work that is different in kind from the caregivers covered by the regulations. Plaintiffs fail to address this conceivably rational basis for the distinction. Instead, Plaintiffs dismiss the potential differences between different types of caregivers and argue that "child-care providers are performing the same work, wherever they happen to work." Pls.' Opp'n at 26. This is no answer, though, to the plausible basis for the distinction offered by Defendants.

Second, treating day cares attached to full-time elementary or secondary schools differently from day cares attached to institutions that do not offer full-time educational services also has a conceivably rational basis. As Defendants note, "OSSE could reasonably think that day cares operated by and co-located with full-time elementary or secondary schools are already

more likely than other institutions to have staff with relevant college degrees, and that there is thus less need to impose a degree requirement on them." Defs.' Mot. at 33. Plaintiffs do not address this potential basis for the distinction. Instead, Plaintiffs argue that this distinction makes the regulations "so underinclusive as to be irrational." Pls.' Opp'n at 26.[6] The Court disagrees. The explanation offered by Defendants represents a potential rational basis for the distinction. OSSE could reasonably decide to target specific childcare institutions that potentially have more underqualified staff. Plaintiffs must do more than merely assert that the distinction is irrational. At this stage, Plaintiffs must show facts that establish there is no conceivable rational basis for the proffered distinction. Although Plaintiffs obviously disagree with this distinction in the regulations, they have failed to overcome the deferential rational basis review.

Third, the distinction between teachers who already have a college degree and those who do not also has a plausible rational basis. Plaintiffs suggest that because it may be possible for a teacher without a college degree to obtain the requisite associate's degree with fewer than twenty-four credit hours in early-childhood education classes, it is irrational to require twenty-four credit hours for those who already possess a college degree in some other subject. Pls.' Opp'n at 24–25. The Court agrees with Defendants, who argue that OSSE had to set the bar somewhere and selecting twenty-four credit hours "as an approximation of a major's worth of

---

[6] Plaintiffs cite *Williams v. Vermont* to suggest that this distinction is similar to a statute that granted car-tax credits to state residents depending on their residency at the time the car was purchased. *See id.* (citing *Williams v. Vermont*, 472 U.S. 14, 23 (1985)). The Court found "no relevant difference between motor vehicle registrants who purchased their cars out-of-state while they were Vermont residents and those who only came to Vermont after buying a car elsewhere." *Williams*, 472 U.S. at 27. Here, there is a conceivably plausible difference between the two categories offered by Defendants such that disparate treatment makes sense. Day care facilities without attached full-time elementary or secondary schools may be more likely to have underqualified caregivers. OSSE could rationally aim to address that potential deficiency.

study easily passes constitutional muster." Defs.' Mot. at 35; *see also Beach Commc'ns*, 508

U.S. at 316 n.7 ("The problems of government are practical ones and may justify, if they do not

require, rough accommodations—illogical, it may be, and unscientific." (quoting *Metropolis*

*Theatre*, 288 U.S. at 69–70)).  Choosing to set the bar at twenty-four credit hours represents a

rational, while perhaps rough, estimate for the appropriate amount of early childhood education

for teachers in child development facilities.  Plaintiffs complain that the regulations will allow

some teachers to comply with the degree requirements while taking fewer early childhood

education classes than others who already have college degrees.  Pls.' Opp'n at 25.  But this

argument fails to account for the fact that teachers without a college degree will be required to

take far more courses to obtain their associate's degree, *see* Am. Compl. ¶ 175 (estimating sixty

credit hours for Ms. Sanchez), than teachers who already have college degrees.  OSSE could

have rationally added the additional classes required for an associate's degree to its calculus for

determining the appropriate amount of education.  But even crediting Plaintiffs' argument, OSSE

did not have to review all possible associate's degree programs to ensure logical coherence

because it "had to draw the line somewhere" and "must be allowed leeway to approach a

perceived problem incrementally."  *Beach Commc'ns*, 508 U.S. at 316.

At bottom, Plaintiffs failed to overcome the "strong presumption of validity" that rational

basis review demands.[7]  *Beach Commc'ns*, 508 U.S. at 314.  As the Supreme Court has stated:

> Defining the class of persons subject to a regulatory requirement—much like
> classifying governmental beneficiaries—"inevitably requires that some persons

---

[7] Plaintiffs cite a number of cases from other jurisdictions to support their claim that equal protection challenges to occupational-licensing requirements can survive a motion to dismiss.  *See* Pls.' Opp'n at 23.  Plaintiffs do not argue, and the Court does not find, that these cases bear any factual resemblance to this case.  The Court agrees that it is not impossible for an equal protection challenge to survive rational basis review.  Plaintiffs' challenge, however, does not.  *See Hettinga*, 677 F.3d at 478–80 (affirming district court's dismissal based on application of rational basis review).

who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration."

*Id.* at 315–16 (quoting *Fritz*, 449 U.S. at 179 (internal quotation marks and citation omitted)); *see also Hettinga*, 677 F.3d at 479 ("Although the classification might indeed be unfair to [plaintiffs], mere disparity of treatment is not sufficient to state an equal protection violation."). Plaintiffs have failed to plead sufficient facts to "establish that there is not 'any reasonable conceivable state of facts that could provide a rational basis for the classification.'" *Hettinga*, 677 F.3d at 479 (quoting *Dumaguin*, 28 F.3d at 1222).[8]  As such, Plaintiffs have failed to state a plausible equal protection claim.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (ECF No. 33) is **GRANTED**. Plaintiffs' motion for discovery notwithstanding the motion to dismiss (ECF No. 32) is **DENIED AS MOOT**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  January 13, 2021                                    RUDOLPH CONTRERAS
                                                            United States District Judge

---

[8] The Court's deferential rational basis review passes no judgment on the wisdom of the challenged regulation's degree requirement, makes no assessment of whether there are actual benefits to be derived therefrom, and offers no evaluation of the real burdens it imposes on workers that may lose their jobs or on parents who are likely to pay more for childcare as a result.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
ALTAGRACIA SANCHEZ,  DALE                 )
SORCHER, and JILL HOMAN,                  )
                                          )
          Plaintiffs,                     )
                                          )
     v.                                   )          Civil Case No. 1:18-cv-00975-RC
                                          )
OFFICE OF THE STATE                       )
SUPERINTENDENT OF EDUCATION               )
and DISTRICT OF COLUMBIA,                 )
                                          )
          Defendants.                     )
_____ )

## NOTICE OF APPEAL

Notice is given this 10th day of February, 2021, that Altagracia Sanchez, Dale Sorcher,

and Jill Homan, Plaintiffs in the above-named case, appeal to the United States Court of Appeals

for the District of Columbia Circuit from a memorandum opinion and order entered in this action

on January 13, 2021, granting Defendants' motion to dismiss (ECF Nos. 38 and 39).

DATE: February 10, 2021                   Respectfully submitted,

                                          /s/ *Renée D. Flaherty*
                                          _____
                                          Renée D. Flaherty (DC Bar No. 1011453)
                                          Robert McNamara (VA Bar No. 73208)*
                                          INSTITUTE FOR JUSTICE
                                          901 North Glebe Road, Suite 900
                                          Arlington, Virginia 22203
                                          Telephone:  (703) 682-9320
                                          Facsimile:  (703) 682-9321
                                          Email:  rflaherty@ij.org; rmcnamara@ij.org

                                          *Attorneys for Plaintiffs*
                                          *Admitted *Pro Hac Vice*

-72-

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 10th day of February, 2021, a true and correct copy of

**NOTICE OF APPEAL** was electronically filed using the Court's ECF system and sent via the

ECF electronic notification system to all counsel and attorneys of record.


/s/ ***Renée D. Flaherty***
Renée D. Flaherty
*Attorney for Plaintiffs*